ORIGINAL

UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

FILED
JUL 22 2008
U.S. COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| HARDIE'S<br>FRUIT & VEGETABLE CO. – SOUTH, L.P. | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | 08-534 C |
| vs. | § | No. ______ |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| DEFENDANT. | § | |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

Bailey & Bailey, P.C.
Theodore M. Bailey
115 East Travis Street, Suite 711
San Antonio, Texas 78205

Telephone: (210) 225-7747
Fax: (210) 225-8246

Dated: July 18, 2008

TABLE OF CONTENTS

I. ISSUES PRESENTED ..... 1
II. STATEMENT OF THE CASE ..... 1
Sysco Has The Power Of Negative Control Over M&S ..... 12
The Size Protest Process ..... 11
III. ARGUMENT ..... 16
A. Jurisdiction ..... 16
B. Standard of Review ..... 16
C. Criteria for Injunctive Relief ..... 16
D. Likelihood of Success on the Merits ..... 17
E. Waiver of the Non-Manufacturer Rule does not Excuse Appellant from the Primary and Vital Requirements of the Solicitation ..... 18
F. The Standard of Review OHA Should Have Applied ..... 19
G. Hardie's Will Suffer Irreparable Harm if Relief is not Granted ..... 26
H. The Harm to Hardie's Outweighs the Harm to the Defendant ..... 27
I. Injunctive Relief will Service the Public Interest ..... 27
IV. CONCLUSION ..... 27

# TABLE OF AUTHORITIES

## STATUTES

28 USC 1491(b)(1) .......... 16

5 USC § 706 (2)(A) .......... 16

## REGULATIONS

13 CFR § 121.103(h)(4) .......... 9, 10, 13, 21

13 CFR § 121.406 .......... 2, 15, 18, 20, 23

48 CFR § 134.314 .......... 20

## CASES

Isratex, Inc. v. United States, 25 Cl. Ct. 223, 231 (1992) .......... 26, 27

Magellan Corp v. United States, 27 Fed. Cl. 446, 450 (1993) .......... 17

Quality Transportation Services, Inc. v. United States, 12 Cl. Ct. 276, 282 (1987) .......... 27

TRW Environmental Safety Systems v. United States, 16 Ct. Cl. 520, 526 (1989) .......... 17, 26, 27

Virginia Petroleum Jobbers Ass'n v. Federal Power Commission, 259 F.2d 921, 923 (1959) .......... 17

Washington Metropolitan Area Transit Authority v. Holiday Inn, 559 F.2d 841, 843 (1972) .......... 17

## ADMINISTRATIVE DECISIONS

American International Ltd, SBA No. 4327 (1998) .......... 19

Empire Home Medical, Inc., SBA No. 4291 (1998) .......... 18

UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| HARDIE'S<br>FRUIT & VEGETABLE CO., - SOUTH, L.P.<br>PLAINTIFF, | §<br>§<br>§<br>§ | |
| vs. | § | No. ____________ |
| UNITED STATES OF AMERICA,<br><br>DEFENDANT. | §<br>§<br>§<br>§ | |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

## I. ISSUES PRESENTED

Did the SBA Office of Hearings and Appeals err in reversing the Size Determination of the Area Office that M&S Foods, Ltd. is not a qualified small business.

## II. STATEMENT OF THE CASE

1. Solicitation number SPM300-06-R-0008 ["the Solicitation"] was issued for fresh produce supply to a large number of Government facilities divided into a number of geographic zones. Complaint Exhibit 1 at page 2 [hereinafter referred to "Exhibit 1", "Exhibit 2", etc.]

2. The objective of the Solicitation was to enter into long-term contracts with commercial firms to supply a full line of USDA No.1 or better quality Fresh Fruit and Vegetable (FF&V) products to Department of Defense (DoD) Troop Issue customers and non-DoD customers to include Job Corps and USDA Supported Customers (Schools and Indian Tribal Organizations). Exhibit 2.

3. The range of entities to be serviced were divided into three major groupings: 1) Group 1 - DoD & other non-USDA School Customers, 2) Group 2 - USDA School Customers, and 3) Group 3 - DoD Export. Exhibit 2.

4. The services to be provided under the Solicitation were also broken down geographically into 12 Regions and 43 zones. The individual regions and zones are listed in Exhibit 2.

5. The Solicitation was set aside 100% for exclusive small business competition. Exhibit 3.

6. As noted in the Solicitation, the U.S. Small Business Administration ["SBA"] issued a waiver of the Non-manufacturer Rule (13 CFR § 121.406) thereby allowing small business receiving the award under a small business set-aside to "procure products from large businesses." Exhibit 3.

7. The resulting contracts awarded under the Solicitation were to be indefinite delivery, indefinite quantity contracts with Economic Price Adjustment provisions based upon cost of materials. Each contract was to provide for an indefinite quantity, within stated limits, of specific supplies or services to be furnished during a fixed period, with deliveries to be scheduled by placing orders with the contractor pursuant to FAR Part 16. Exhibit 3.

8. These contracts were to be for an 18-month base term with three 18-month option periods, with a maximum period of 72 months (6 years). Exhibit 3.

9. The Solicitation provided estimated values for each zone as listed in Exhibit 3.

10. The Solicitation contains a number of very specific primary and vital services which any successful offeror must be capable to perform at any of the listed locations:

**XIII. DELIVERY INSTRUCTIONS**

A. Vendors shall ensure all products are delivered in sanitary trucks that are of a commercially acceptable standard. All trucks shall maintain proper temperatures, as determined through standard commercial practices.

B. Deliveries shall be F.O.B. destination to all ordering activities and delivery points. All items will be delivered to customer locations, free of damage, with all packaging and packing intact.

The contractor shall remove all excess pallets used for delivery from the delivery point. A
listing of all the delivery points per zone can be found at:
http://www.dscp.dla.mil/subs/produce/pv/region.htm

C. Troop installation & USDA delivery schedules (days and times) routes and stop-off sequence will be coordinated and verified with the customers on a post award basis by the awardee(s).

In general, each Troop customer receives three (3) deliveries per week and each USDA customer receives one (1) delivery per week.

D. Products for individual customers/dining facilities must be segregated. Many of the military bases have more than one delivery point. All product shall be segregated by drop-off point and loaded into the delivery vehicle in reverse drop sequence. The intent is to provide expeditious off-loading and delivery to the customer.

E. The offeror shall also ensure that the personnel loading and delivering the product provide prompt and efficient service to the customer.

**XIV. INSPECTION AND ACCEPTANCE**

A. Inspection and Acceptance of products will be performed at destination. The inspection is normally limited to identity, count and condition; however, this may be expanded if deemed necessary by either the military Veterinary Inspector, Dining Facility Manager, Food Service Advisor/Officer, or the Contracting Officer. Delivery vehicles may be required to stop at a central location for inspection before proceeding to the assigned delivery point(s). In addition, the delivery vehicles will be inspected for cleanliness and condition. Supplies transported in vehicles that are not sanitary, or which are not equipped to maintain prescribed temperatures, may be rejected without further inspection.

B. The authorized receiving official at each delivery point is responsible for inspecting and accepting products as they are delivered. The delivery ticket shall not be signed prior to the inspection of each product. All verages/shortages/returns are to be noted on the delivery ticket by the receiving official and truck driver. The authorized receiving official's signature on the delivery ticket denotes acceptance of the product.

C. The contractor shall forward three (3) copies of the delivery ticket with the shipment. The receiving official will use the delivery ticket as the receipt document. Two (2) copies of the signed and annotated delivery ticket will serve as the acceptance document. No electronic invoice may be submitted for payment until acceptance is verified. Additionally, upon completing the delivery (or deliveries ) and before the carrier leaves the installation, copies of the invoices may be required to be delivered to a central "Accounting/Troop Issue" activity on the installation.

Exhibit 4.

11. Other significant services required by the Solicitation made it clear that any successful offeror would be required to ship from their own facility, or specific geographic area. The Solicitation requires with respect to offeror capacity and facilities:

**XI. ITEM AVAILABILITY**

A. Vendors must have access to items in sufficient quantities to fill all ordering activity requirements. It is critical that items

ordered be routinely delivered on a "skip day" basis, at a minimum.

B. Vendors shall notify the customer within 24 hours of order placement of the non-availability of any item. Vendors shall offer the customer a substitute of equal or higher quality and at an equal or lower cost, or advise them of the not-in-stock position of the item. Substituted product shall not be delivered without prior consent by the customer. Substituted items must be noted as such on the invoice.

**XII. PACKAGING, PACKING, LABELING AND MARKINGS**

A. All packaging and packing shall be in accordance with good commercial practice. Labeling shall be in accordance with commercial labeling complying with the Federal Food, Drug and Cosmetic Act and regulations promulgated thereunder. Shipping containers shall be in compliance with the National Motor Freight Classification and Uniform Freight Classification Code.

B. To ensure that the carrier and the receiving activity properly handle and store items, standard commercial precautionary markings such as "KEEP REFRIGERATED" shall be used on all cases when appropriate.

Exhibit 5.

* * *

**XXIV. WAREHOUSING AND SANITATION PROGRAM/STORED PRODUCT PEST MANAGEMENT**

The contractor shall develop and maintain a sanitation program and a stored product pest management program for food and other co-located non-food items that comply with industry standard programs such as the Code of Federal Regulations, Title 21, part 110, Food Manufacturing Practices, the Federal Insecticide, Fungicide and Rodenticide Act, the Food, Drug, and Cosmetic Act of 1938 as well as all pertinent state and local laws and regulations. Records of inspections performed by the firm, subcontractor, or recognized industry association shall be maintained and made available to the Government at the Contracting Officer's request. Any findings by the firm or its agent documenting a critical sanitation deficiency shall be reported

immediately to the Contracting Officer with an attached report of corrective action.

Exhibit 6.

* * *

**XXX. FORCE PROTECTION**

DSCP Subsistence Directorate provides world-wide subsistence logistics support during peace time as well as during regional conflicts, contingency operations, national emergencies, and natural disasters. At any time, the United States Government, its personnel, resources and interests may be the target of enemy aggression to include espionage, sabotage, or terrorism.

This increased risk requires DSCP to take steps to ensure measures are taken to prevent the deliberate tampering and contamination of subsistence items. The offeror must ensure that products and/or packaging have not been tampered with or contaminated throughout the growing, storage, and delivery process. The offeror must immediately inform DSCP Subsistence of any attempt or suspected attempt by any party or parties, known or unknown, to tamper with or contaminate subsistence supplies.

As the holder of a contract with the Department of Defense, the awardees should be aware of the vital role they play in supporting our customers. It is incumbent upon the awardees to take all necessary actions to secure product delivered to all military customers, as well as any applicable commercial destinations.

**XXXI. SURGE/MOBILIZATION**

1. *Surge*: The capability to handle a large increase in case volume for short periods of time with very little lead-time may be required at various times throughout the term of the contract.

Services may experience unscheduled arrival of troops, with only a few hours notice, as part of normal operations, where the order requirements could more than double from their normal usage on a given days notice. The timing of these types of surges will be impossible to anticipate. Pricing for

> items furnished in this fashion shall be the same as those for routine, SPM300-06-R-0008 Page 21 of 78 non-surge orders.
>
> 2. *Mobilization:* Offeror must be capable of support a tripling of ordering requirements for an extended period of time in the event of a full-scale military mobilization or national emergency. As with surge support, pricing for items furnished in this fashion shall be the same as those for routine, non-mobilization orders.
>
> 3. When units deploy for training exercises outside their zone, their current vendor will be given the opportunity to supply the unit's requirements. If the current vendor cannot perform this function at no additional cost, or the Vendor does not wish to accept the mission, the requirements will be turned over to the vendor supporting the zone in which training will occur.

Exhibit 7.

12. Offers under the Solicitation were due on September 21, 2006. Hardie's timely submitted a proposal. Exhibit 1.

13. On March 12, 2008, Hardie's received a letter from the Defense Logistics Agency, Defense Supply Center Philadelphia ["DSCP"] announcing that award under the Solicitation would be made to M&S Foods, Ltd., Co. ["M&S Foods"] for the San Antonio Zone. Exhibit 8.

14. M&S has its principal office in Newberry, Florida. M&S performs food distribution contracts to public facilities in the State of Florida through subcontracting relationships with large business food distributors identified on its corporate website. Exhibit 10.

15. M&S owns no warehouse or other produce storage facilities in the State of Texas. Exhibit 9 at page 4. M&S does not own any distribution facilities or vehicles in the State of Texas. Exhibit 9 at page 4.

16. M&S must rely entirely upon the supply and distribution capabilities of a subcontractor to perform this contract, as it only has at most the ability to process orders and billing with its own resources. Exhibit 9 at page 4.

17. M&S was previously awarded certain interim contracts for this requirement starting December, 2006, for interim coverage at Fort Hood, Texas while award under the present Solicitation was pending. M&S' apparently successful proposal on that contract was based upon a subcontract with Fresh Point-City Produce LP, a wholly-owned subsidiary of Sysco Corporation ["Sysco"]. Exhibit 9 at page 4. Because of M&S' lack of capabilities to perform the contract, it was unduly reliant upon Sysco and Sysco's affiliates to perform those contracts.

18. M&S is not a legitimate small business qualified to perform this requirement, but is, instead, entirely reliant upon produce giant Sysco Corporation, a large business. Exhibit 9 at page 4.

19. Under filing number 800601820, Fresh Point is the Assumed Name of a foreign limited partnership formed in Delaware. Exhibit 11. The official name of Fresh Point is Fresh Point – City Produce LP. Exhibit 11. The General Partner of Fresh Point – City Produce LP is FreshPoint, Inc. Exhibit 11. Freshpoint, Inc. is a wholly-owned subsidiary of Sysco Corporation. Exhibit 12, 13 and 14. In the Texas Franchise Tax information return for FreshPoint – City Produce LP, the address is listed as 1390 Enclave Parkway, Houston Texas 77077. Exhibit 15. The same address is used for Sysco Corporate Offices in Houston, Texas. Exhibit 16.

20. M&S is relying upon the same subcontract relationship with Sysco to perform any contract awarded under the subject Solicitation.

21. M&S has received a number of weekly awards for furnishing produce in 2007, using Sysco as its subcontractor without exception, further deepening its reliance upon Sysco.

22. The subject procurement was set aside exclusively for small business competition. As such offerors and their affiliates in aggregate must not exceed the applicable size standard for this procurement. The ostensible subcontractor rule is an independent basis for finding affiliation between two concerns. 13 C.F.R. § 121.103(h)(4). This subsection provides:

> (4) A contractor and its ostensible subcontractor are treated as joint venturers, and therefore affiliates, for size determination purposes. An ostensible subcontractor is a subcontractor that performs primary and vital requirements of a contract, or of an order under a multiple award schedule contract, or a subcontractor upon which the prime contractor is unusually reliant. All aspects of the relationship between the prime and subcontractor are considered, including, but not limited to, the terms of the proposal (such as contract management, technical responsibilities, and the percentage of subcontracted work), agreements between the prime and subcontractor (such as bonding assistance or the teaming agreement), and whether the subcontractor is the incumbent contractor and is ineligible to submit a proposal because it exceeds the applicable size standard for that solicitation.

23. The purpose of the rule is to prevent other than small firms from forming superficial subcontract relationships with large firms to evade SBA's size requirements.

24. The ostensible subcontractor rule permits an SBA Area Office to find when making a Size Determination that a subcontractor and a prime contractor, in effect, have formed a joint venture (and are thus affiliates) for determining size, even though the actual agreement is in the form of a subcontract or other non-joint venture contractual arrangement.

25. An ostensible subcontractor is a subcontractor that performs primary and vital requirements of a contract or a subcontractor upon which the prime contractor is unusually reliant. 13 C.F.R. § 121.103(h)(4). This is therefore a disjunctive test. If the subcontractor either performs "primary and vital requirements" of the contract or is one upon which the prime contractor is "unduly reliant", then the "ostensible subcontractor" rule will apply.

26. In determining whether a subcontractor performs primary and vital requirements or that the prime is unusually reliant, all aspects of the prime-subcontractor relationship must be considered including, but not limited to, the terms of the proposal, agreements between the prime and the subcontractor (such as teaming agreements), and whether the subcontractor is an incumbent contractor and is ineligible to submit a proposal because it exceeds the size requirements for the solicitation.

27. In the instant case, both the "primary and vital requirements" prong, and the "unduly reliant" prong of the ostensible subcontractor rule apply.

28. Sysco will perform virtually all primary and vital requirements of the contract awarded on this Solicitation. Sysco warehouses and delivers all of the actual food purchased by the Government. Exhibit 9 at page 6. M&S' only role in the contract is to receive the orders, pass them to Sysco, then bill the Government based on billing prepared by Sysco. Exhibit 9 at page 6. M&S, therefore, performs no actual productive work on the contract.

29. Furthermore, because M&S has no produce inventory of its own, has no warehouse capability, and has no distribution capability of its own, Exhibit 9 at page 8, it is unduly reliant on Sysco . M&S literally cannot perform any requirements of this

contract without Sysco . It cannot deliver any of the required items of food with its own efforts. It does not have the product, storage facilities or distribution capability to do so.

30. Because M&S lacks the capability to perform the primary and vital requirements of this procurement without reliance upon the resources of Sysco , the two are affiliated under the ostensible subcontractor rule and their size is aggregated, and M&S is therefore other than small.

31. If all that was required of an offeror under the Solicitation was to receive an order and simply pass it along to a large business source of supply, without more, there would be no need for the Government to address in the Solicitation such details of delivery, title to pallets, much less for the Government to conduct a site visit to an office that does nothing but receive orders and pass them along. A site visit to a facility that handles and ships fresh produce would make perfect sense, though.

32. Without falling back on Sysco's capabilities, there is no method by which M&S could demonstrate the ability to provide the product, meet the required delivery schedules, or demonstrate an ability to protect secure food supplies from contamination and tampering.

<u>Sysco Has The Power of Negative Control Over M&S</u>

33. As discussed at length above, it is clear that without the resources and capabilities of Sysco , M&S could not perform this contract at all. Because M&S is totally dependent upon Sysco for all aspects of actual performance, Sysco has the power of negative control over M&S because if Sysco were to withhold its services, M&S would fail entirely and default on this contract, jeopardizing the company as a whole. Because M&S is utterly dependent upon Sysco. Sysco has power of negative

control over M&S and the two firms are affiliated for size purposes.

The Size Protest Process

34. Plaintiff timely filed a size protest with the Contracting Officer within five calendar days of the date it received notice of award to M&S. Exhibit 9 at page 4.

35. On March 18, 2008, the Contracting Officer forwarded the size protest to the Small Business Administration (SBA) Office of Government Contracting- Area III Area Office, in Atlanta, Georgia. Exhibit 17 at page 2.

36. On April 17, 2008, the Area Office for Area III of the SBA issued a size determination finding that M&S was not a legitimate small business. Exhibit 17 at page 2. The Area Office SBA acknowledged the waiver of the non-manufacture rule was granted for the procurement allowing a small business to buy from a large business. The Area Office of the SBA stated that the waiver does not cede the prime contractor's responsibility to perform the primary and vital requirements of the contract. Exhibit 17 at page 2. The Area Office found M&S not to be a qualified small business for this procurement due to its undue reliance upon the resources of Sysco to be able to perform the requirements of the Solicitation. Exhibit 17.

37. The Area Office also made the following factual findings which are pertinent:

> Are there discrete tasks to be performed by each of the teaming partners or is there commingling of personnel and resource: MS stated that the teaming agreement proposed is a specific plan for the performance of the contract. The documentation provided shows City will procure and deliver perishable products. DSCP is also a customer of City. In a letter submitted with the proposal it states in bold print that, "MS will utilize Sysco as its supplier/shipper. MS is

responsible for all accounts payables and receivables incurred in this solicitation."

* * * *

On March 20, 2008, the Area Office requested the NAICS code for this procurement since we could not find it on the solicitation. The Small Business Specialist for the procuring office responded "NAICS 424480, Fresh Fruit & Vegetable Merchant Wholesalers, with Nonmanufacturer size standard of 500 employees." At this time we requested the waiver of the Nonmanufacturer Rule since this NAICS code was not on the waiver list. A waiver of the Nonmanufacturer Rule was granted on March 16, 2006, from the Small Business Administration in Washington, D.C. The waiver was for the purchase to cover the full line of various fresh fruits and vegetables under the above mentioned contract. This seems to be the correct NAICS code for this procurement since this is the descriptor used in the first page of the solicitation (Full Line Fresh Fruit and Vegetable). Thus, a waiver allows a small business to buy from a large business. This waiver does not relinquish the Prime contractor from performing the primary and vital requirements with its own employees. The waiver does not prevent us from determining if the ostensible subcontractor rule applies. See 13 CFR § 121.103(h) (4).

The NAICS code 424480 states Fresh Fruit and Vegetable Merchant Wholesalers. According to the NAICS definition, this industry comprises establishes primary engaged in the merchant wholesale distribution of fresh fruits and vegetables. According to Webster's Dictionary a wholesaler is defined as a business that sells in large quantities to other businesses. According to the dictionary, to distribute is to divide, deliver or give out the fruits and vegetables. The scope of work indicates that the contractor shall deliver the produce to the San Antonio area. In the Delivery Instructions of the solicitation Section XII, vendors shall ensure all products are delivered in sanitary trucks. Products for individual customers/dining facilities must be segregated. Many of the military bases have more than one delivery point. In general, each Troop customer receives three deliveries per week and each USDA customer receives one delivery per week. In section XI, Item Availability, vendors must have access to items in sufficient quantities to fill al ordering activity requirements. Section XII, Packaging,

Packing, Labeling and Markings, all packaging and packing shall be in accordance with good commercial destination. The solicitation MS submitted under Place of Performance, offeror intends to use Fresh Point/City Produce at 5830 Rocky Point Drive in San Antonio, Texas. The solicitation clearly outlines the requirements as ordering from electronic catalogs, customer services, ordering system, order placement, item availability, packaging, packing, labeling and markings, delivery instructions, inspection and acceptance, rejection/return procedures, invoicing, etc.

The Department of Health & Human Services inspected the City facilities in Texas and submitted a detail report on their findings. Specifically as defined in the work statement, the delivery and warehousing of the produce are the primary and vital requirements of this contract. MS states in the proposal that they are handling the day to day management of this solicitation. MS is responsible for all accounts payables and receivables incurred in this solicitation. However, without City, MS would not have the ability to provide the produce, meet the required deliveries, warehouse the produce, label, package and distribute the produce.

Documentation provided to SBA clearly states that the primary and vital requirements of the contract – the wholesale distribution of fruits and vegetables – will be performed by City, a company owned in part by Fresh Point, which is owned by Sysco, a large company (As stated by the Department of Health and Human Services, Establishment Inspection Report dated 2/27/2006 submitted as an attachment with MS proposal). The teaming agreement states that MS shall take the lead in negotiating…subject to review and approval by City. Further MS shall, as Primary Contractor, retain primary control over and responsibility for prime contractor performance, subject to review and approval by City. MS will submit a prime contract proposal and will be responsible for the final editing, printing and submittal of the necessary proposal documents to the government, all subject to review and approval by City. In the teaming agreement statement of work, the security fence surrounding City's facility is outlined, including but not limited to inspection at the dock door, refrigerated warehouse temperature sensors and any variation signals an alarm, and delivery vehicles are washed and the interior is pressured washed daily and pre-cooled prior to any loadings of products. MS clearly cannot perform any of the

> requirements of this procurement without City, the more complex and costly function of the contract.
>
> Based on the totality of the circumstances, taking into consideration all of the above factors, it is determined that MS is unduly reliant on its subcontractor, City. The contractor is also relying heavily on the experience and background of the subcontractor, who is supplying and shipping the produce. In Size Appeal of Crown Support Services, Inc., SBA No. SIZ-3294 (1990), one of the factors mentioned was the emphasis placed upon the subcontractor's background and skills.

Exhibit 9 at 9.

38. On April 22, 2008, M&S Foods filed an appeal with the SBA Office of Hearings and Appeals (OHA). Exhibit 17 at page 2.

39. On July 15, 2008, the United States Small Business Administration Office of Hearing and Appeals reversed the Area Office of the SBA's size determination and ruled that M&S Foods was a small business. Exhibit 17 at page 7.

40. The SBA OHA did not find that M&S was capable of performing all aspects of the Solicitation. Instead, the SBA OHA held that the SBA's grant of a waiver of the nonmanufacturer rule (13 CFR 121.406) meant that M&S did not have to perform many of the primary and vital requirements of the Solicitation with its own efforts, despite the fact that, as the Solicitation expressly noted, the waiver only permitted offerors to "to procure products from large businesses", not wholesale subcontract the most labor intensive and vital requirements of the Solicitation. Exhibit 17 at page 5.

41. Because SBA OHA's decision constitutes legal error, Plaintiff brings this action.

## III. ARGUMENT

### A. Jurisdiction

The Court has jurisdiction over this bid protest pursuant to 28 U.S.C. 1491(b)(1). Section 1491(b) (4) explicitly provides that, in any action under 1491 (b), "the courts shall review the agency's decision pursuant to the standard set forth in Section 706 of Title 5," the Administrative Procedure Act.

### B. Standard of Review

In reviewing decisions of administrative agencies, such as the United States Defense Logistics Agency and the Small Business Administration, the Court declares unlawful and set aside all agency action, findings, and conclusions that it finds "arbitrary, capricious, an abuse or discretion, or otherwise not in accordance with law." 5 U.S.C. §706 (2)(A).

In this case, there is a second layer to the standard of review. The decision contested is an administrative appeal decision of the SBA Office of Hearings and Appeals from a size determination of an SBA Area Office. Under SBA's regulations, OHA was required to uphold the Area Office's determination unless there existed in the record a "clear error of fact or law".

### C. Criteria for Injunctive Relief

In order to obtain temporary relief, Hardie's must demonstrate:

1. substantial probability that the Plaintiff will prevail on the merits;
2. irreparable harm to the Plaintiff unless the injunction is granted;
3. absence of substantial harm to other interested parties; and
4. absence of harm to the public interests.

Virginia Petroleum Jobbers Ass'n v. FRC 104 U.S. App. D.C. 106 Federal Power Commission, 259 F.2d 921, 923 (D.C. Cir. 1959). However, the evidence presented for each of these criteria is balanced by the Court on a sliding scale basis. A much stronger showing on one or more of the necessary factors lessens the amount of proof required for the remaining factors. Washington Metropolitan Area Transit Authority v. Holiday Inn, 559 F.2d 841, 843(D.C. Cir. 1972).

The Plaintiff will address the four above enumerated factors in light of the facts and applicable cases. For the reasons set forth below, Plaintiff submits that it is entitled to the relief sought.

D. Likelihood of Success on The Merits

In considering whether to grant interim injunctive relief pending a final decision on the merits, the Court of Federal Claims has consistently held that the "likelihood of success" is a flexible factor and does not require a certain "mathematical probability." Magellan Corn v. United States, 27 Fed. Cl. 446, 450 (1993); TRW Environmental Safety Systems, Inc. v. United States, 16 Cl.Ct. 520, 526 (1989) . For purposes of a preliminary injunction, it is sufficient if the plaintiff can demonstrate either (1) "a combination of probable success on the merits and the possibility of irreparable injury," or (2) "that serious questions are raised and the balance of hardships tips sharply in favor" of the plaintiff. Id. at 527. As demonstrated below, Hardie's request for temporary and preliminary injunctive relief meets these standards. In the first instance, the legal errors complained of above are straightforward and clear.

E. Waiver of the Non-Manufacturer Rule Does not Excuse Appellant from the Primary and Vital Requirements of the Solicitation

The general rule is that on a small business set aside, a small business concern to be qualified to provide manufactured products, including the food products covered by the solicitation, must be the manufacturer of the products or qualify as a nonmanufacturer, kit assemble, or supplier under Simplified Acquisition Procedures. 13 CFR § 121.406(a). The "nonmanufacturer" exception requires the small business to (1) have less than 500 employees, (2) be primarily engaged in retail or wholesale trade, and normally sell the type of item supplied, and (3) supply the end item of small business manufacturer unless there is a class or individual item waiver. 13 CFR § 121.406 (b)(3).

SBA OHA incorrectly found that the waiver of the nonmanufacturer rule in this Solicitation completely excused the fact that, as the Area Office specifically found, M&S was entirely reliant upon Sysco not only to provide the produce under the solicitation, but to warehouse and deliver the product as well, leaving M&S doing only some paperwork. In so finding, OHA's decision contains clear errors of law.

A waiver of the non-manufacturer rule simply allows a small business to provide a product that is manufactured by a large business, since a waiver only waives the requirements under 13 CFR § 121.406(b)(iii) and does not waive the nonmanufacturer requirements of 13 CFR § 121.406(b)(1)(i) & (ii). 13 CFR § 121.406(b)(3). A waiver of the non-manufacturer rule does not permit a small business to violate the ostensible subcontractor rule to rely entirely on a large business not just for supply of the product, but also for the primary and vital services which are explicitly required by the

Solicitation. In addition, the waiver does not affect the requirement that M&S has to be in the wholesale or retail trade. 13 CFR § 121.406 b(b)(1)(ii).

Since, the waiver of the nonmanufacturer rule only permits the small business concern to supply the product of a large business, it does not permit M&S to subcontract all of the other primary and vital requirements of being a "Fresh Fruit and vegetable Merchant Wholesaler" under the applicable NAICS 424480. As the Area Office correctly observed, the definition of a Wholesaler is one who not only takes orders for product, but who actually stores, handles, "divides and delivers" that product to its customers which in the case of wholesalers are other businesses. Exhibit 9 at 7. M&S does none of these things. Thus, to the extent that OHA found that a wholesaler need only facilitate the purchase of goods from one entity for delivery to another without actually storing, handling, dividing and delivering any of the goods, that finding was legally erroneous. The apparent OHA definition of a wholesaler does not comport with the NAICS definition and no other authority exists for it.

In any event, M&S does not qualify as a nonmanufacturer. To qualify as a nonmanufacturer, a firm must: 1) meet the 500 employee size standard, and 2) must "be primarily engaged in wholesale or retail trade normally selling the items being supplied to the general public[.]" Empire Home Medical, Inc., SBA No. 4291 (1998). There was no probative evidence in the record before OHA that M&S actually sells the items being supplied to the general public, or to anyone outside of its entirely captive relationship with Sysco. M&S provided evidence that it is licensed to do so, but not evidence that it provides wholesale produce to anyone outside of that captive

relationship. M&S is therefore not a legitimate wholesaler. American International Ltd., SBA No. 4327 (1998).

F. The Standard of Review OHA Should Have Applied

Under SBA's size appeal procedures, the OHA may only reverse an Area Office decision where the appellant succeeds in showing that there has been a "clear error of fact or law". 13 CFR § 134.314. OHA itself has described that standard as follows: "In evaluating whether mere is a clear error of fact or law, OHA does not consider Appellant's size de novo. Rather, OHA reviews the record to determine whether the Area Office based its size determination upon a clear error of fact or law." Exhibit 17 at 4.

Unfortunately, in the instant case, OHA's decision reads like a de novo determination. Nowhere does OHA identify any clear factual error committed by the Area Office. Accordingly, those facts stand as correct, including the Area Office's finding that:

> Are there discrete tasks to be performed by each of the teaming partners or is there commingling of personnel and resource: MS stated that the teaming agreement proposed is a specific plan for the performance of the contract. The documentation provided shows City will procure and deliver perishable products. DSCP is also a customer of City. In a letter submitted with the proposal it states in bold print that, "MS will utilize Sysco as its supplier/shipper. MS is responsible for all accounts payables and receivables incurred in this solicitation."
>
> * * * *
>
> On March 20, 2008, the Area Office requested the NAICS code for this procurement since we could not find it on the solicitation. The Small Business Specialist for the procuring office responded "NAICS 424480, Fresh Fruit & Vegetable Merchant Wholesalers, with Nonmanufacturer size standard

of 500 employees." At this time we requested the waiver of the Nonmanufacturer Rule since this NAICS code was not on the waiver list. A waiver of the Nonmanufacturer Rule was granted on March 16, 2006, from the Small Business Administration in Washington, D.C. The waiver was for the purchase to cover the full line of various fresh fruits and vegetables under the above mentioned contract. This seems to be the correct NAICS code for this procurement since this is the descriptor used in the first page of the solicitation (Full Line Fresh Fruit and Vegetable). Thus, a waiver allows a small business to buy from a large business. This waiver does not relinquish the Prime contractor from performing the primary and vital requirements with its own employees. The waiver does not prevent us from determining if the ostensible subcontractor rule applies. See 13 CFR § 121.103(h) (4).

The NAICS code 424480 states Fresh Fruit and Vegetable Merchant Wholesalers. According to the NAICS definition, this industry comprises establishes primary engaged in the merchant wholesale distribution of fresh fruits and vegetables. According to Webster's Dictionary a wholesaler is defined as a business that sells in large quantities to other businesses. According to the dictionary, to distribute is to divide, deliver or give out the fruits and vegetables. The scope of work indicates that the contractor shall deliver the produce to the San Antonio area. In the Delivery Instructions of the solicitation Section XII, vendors shall ensure all products are delivered in sanitary trucks. Products for individual customers/dining facilities must be segregated. Many of the military bases have more than one delivery point. In general, each Troop customer receives three deliveries per week and each USDA customer receives one delivery per week. In section XI, Item Availability, vendors must have access to items in sufficient quantities to fill al ordering activity requirements. Section XII, Packaging, Packing, Labeling and Markings, all packaging and packing shall be in accordance with good commercial destination. The solicitation MS submitted under Place of Performance, offeror intends to use Fresh Point/City Produce at 5830 Rocky Point Drive in San Antonio, Texas. The solicitation clearly outlines the requirements as ordering from electronic catalogs, customer services, ordering system, order placement, item availability, packaging, packing, labeling and markings, delivery instructions, inspection and acceptance, rejection/return procedures, invoicing, etc.

The Department of Health & Human Services inspected the City facilities in Texas and submitted a detail report on their findings. Specifically as defined in the work statement, the delivery and warehousing of the produce are the primary and vital requirements of this contract. MS states in the proposal that they are handling the day to day management of this solicitation. MS is responsible for all accounts payables and receivables incurred in this solicitation. However, without City, MS would not have the ability to provide the produce, meet the required deliveries, warehouse the produce, label, package and distribute the produce.

Documentation provided to SBA clearly states that the primary and vital requirements of the contract – the wholesale distribution of fruits and vegetables – will be performed by City, a company owned in part by Fresh Point, which is owned by Sysco, a large company (As stated by the Department of Health and Human Services, Establishment Inspection Report dated 2/27/2006 submitted as an attachment with MS proposal). The teaming agreement states that MS shall take the lead in negotiating…subject to review and approval by City. Further MS shall, as Primary Contractor, retain primary control over and responsibility for prime contractor performance, subject to review and approval by City. MS will submit a prime contract proposal and will be responsible for the final editing, printing and submittal of the necessary proposal documents to the government, all subject to review and approval by City. In the teaming agreement statement of work, the security fence surrounding City's facility is outlined, including but not limited to inspection at the dock door, refrigerated warehouse temperature sensors and any variation signals an alarm, and delivery vehicles are washed and the interior is pressured washed daily and pre-cooled prior to any loadings of products. MS clearly cannot perform any of the requirements of this procurement without City, the more complex and costly function of the contract.

Based on the totality of the circumstances, taking into consideration all of the above factors, it is determined that MS is unduly reliant on its subcontractor, City. The contractor is also relying heavily on the experience and background of the subcontractor, who is supplying and shipping the produce. In Size Appeal of Crown Support Services, Inc., SBA No. SIZ-3294 (1990), one of the factors

> mentioned was the emphasis placed upon the subcontractor's background and skills.

Exhibit 9 at page 7-9.

The only "clear error" identified by OHA in its decision was an alleged "clear error of law" with respect to the scope of the waiver of the non-manufacturer rule under 13 CFR § 121.406. The OHA's decision hinges on one conclusory finding by OHA that is simply asserted without citation to supporting evidence or legal authority:

> An individual waiver is more comprehensive in scope than a less specific class waiver because the SBA has already completed a review of the precise requirements of the product and supply chain before granting a waiver for the solicitation.

Exhibit 17 at page 5. This apparent statement of law does not find support in the test set out in 13 CFR § 121.406, nor did OHA cite any case law or other authority so holding. There is legal authority for any presumed breadth of a waiver of the non-manufacturer rule beyond the language of the waiver itself. Indeed, OHA then proceeds to apply the language so broadly as to deprive the language of the waiver itself of any significant meaning.

As the OHA observed in its decision, the actual language of the waiver states its scope as follows:

> A waiver of the Nonmanufacturer Rule is hereby established for the purchase to cover the line of various fresh fruits and vegetables in the [Produce Prime Vendor], under contract number SMP300-06-R-0008.

[Emphasis added]. Exhibit 17 at page 5. The above quoted language is very clear as to the scope of the waiver- it is limited to the purchase of produce from large businesses. Nothing in that language evinces any intent that the waiver extend to any

other aspect of performance of the Solicitation other than the source of purchase of the product itself.

The Area Office found as a mixed finding of fact and law that the scope of the waiver was simply "for the purchase to cover the full line of various fresh fruits and vegetables" under the Solicitation, and that the "waiver allows a small business to buy from a large business." [Emphasis added.]

That is the proper scope of the waiver. It permits a small business to provide the product of a large business, but is not simply carte blanche for a small business to delegate all of the primary and vital functions of the contract to a large business. That is how Hardie's, a legitimately qualified small business, proposes to perform this contract.

Instead, without citation to any evidence in the record, or any legal authority, OHA simply asserted that:

> Based on the text of the waiver, the solicitation and the unique temperature, food safety, and inventory requirements in buying, storing and delivering fresh produce, it is clear the individual waiver applies to the entire procurement, including warehousing and delivery of the produce.

Exhibit 17 at page 6. On the contrary, it is not clear at all that the phrase "purchase … fresh fruits and vegetables" includes post-purchase services including food safety, inventory turnover, products freshness, temperature and humidity controls, distribution, warehousing, force protection, and the myriad other services required under the Solicitation after the product is purchased by the contractor.

This holding is precisely what OHA may not do in reviewing an Area Office size determination. OHA in this decision simply reviewed the matter de novo and made its

own factual findings, and decided for himself what he thought the scope of the waiver should be. What OHA should have done was review the record to see if the Area Office's interpretation was supported by that record. Instead, OHA merely declared the Area Office wrong without citing anything in the record which indicated that the Area Office was incorrect.

The OHA's unsupported factual assertions and non sequitur legal findings continue with OHA's statement that "SBA accepted the Contracting Officer's determination that no small business manufacturers are capable of performing the contract in accordance with the Government's specifications." Exhibit 17 at page 6. There is no evidence that Contracting Officer never made any determination that no small business could perform any or even most of the primary and vital functions of the Solicitation. The only finding was that to perform the contract, a small business would have to purchase product from a large business, not subcontract all the post purchase warehousing, distribution, and other contract required services.

In that regard, OHA, without any evidence in the record to suggest it, seemed to be operating under the assumption that no small business could perform the warehousing and delivery functions of the Solicitation without complete reliance on a large business. That is nowhere supported in the record, and is simply not true. Hardie's itself is capable of performing those functions without subcontracting them to Sysco or another large business in the food industry, and demonstrated that to the Government in its proposal.

Another illogical aspect of OHA's holding is the fact that OHA took the Area Office to task for having found M&S to be small in a different size determination on

another contract in response to a different protest. As Hardie's pointed out to OHA in its response to the appeal petition, one area office determination has no binding effect on any other size determination. OHA did not even review the prior size protest because of lack of standing and because it was untimely which resulted. Since this office filed both protests, we can say that they were not the same. Issues arose after the issuance of the February 23, 2007, size determination and in that size determination itself that were not addressed in the previous size protest. The only aspect that was the same was that then, as now, M&S is no more than a front for Sysco. Additional arguments and evidence were marshaled by this office and Hardie's based upon the experience in that prior protest. The fact that the Area Office decided the issue differently, when presented with different arguments and evidence, should not have been problematic.

From a policy standpoint, OHA's decision turns the purpose of the nonmanufacturer waiver on its head. Instead of merely recognizing how legitimate small businesses function in a particular industry, which in this case includes only the purchase of product from large businesses without more, OHA's interpretation is a blank check to produce giants, like Sysco, to set up a small invoicing and customer service front so Sysco can obtain business for which it has no right to compete.

In summary, OHA's decision takes a limited waiver of the nonmanufacturer rule which waived that rule as to purchase of product, only, and without legal authority or factual support in the record, expanded that waiver to cover a wide range of post-purchase services. The end result is that M&S, which neither produces, warehouses nor delivers the product which the Government is buying, and which is entirely

dependent on a single large business to do so, is deemed a legitimate small business. That decision was clearly in error.

G. Hardie's Will Suffer Irreparable Harm If Relief Is Not Granted

As this Court's predecessor stated in TRW, supra:

> ... plaintiff moving for preliminary injunction need only allege, in order to establish irreparable injury, that by failing to enjoin, it will not be awarded the contract and will lose profits there under.... [This is] based upon the proposition that an unsuccessful bidder's damages are limited at law to bid preparation costs.

TRW 16 Cl. Ct. at 529; See also Quality Transportation Services, Inc. v. United States, 12 Cl.Ct. 276, 282 (1987) (irreparable harm is shown if a contract will not be awarded and the plaintiff would not earn the resulting profits); Isratex, Inc. v. United States, 25 Cl. Ct. 223, 231 (1992) (a plaintiff is irreparably damaged since an action at law allows plaintiff to recover only its bid preparation costs). Here, as in the above cited cases, if injunctive relief does not issue, Hardie's will suffer that same harm in the form of lost profits that befalls every Plaintiff to a bid protest. There is no cognizable action by a disappointed bidder for money damages for such lost profits. The harm to Hardie's would therefore be unremediable.

H. The Harm to Hardie's Outweighs the Harm to the Defendant

The Court must consider whether a TRO or preliminary injunction will substantially injure the other parties in the proceeding. As discussed above, if Hardie's request for injunctive relief is not granted, it will suffer the loss of a contract and the profits associated with it. The Defendant, if enjoined, still has contractual vehicles available through which it can continue to obtain the needed services uninterrupted, as it has done throughout the procurement process to date. In addition, as noted in

Isratex, supra. at 231, the harm to Plaintiff from the denial of fair and honest consideration of its proposal, as well as the deprivation of the benefits Congress intended to bestow upon small business program participants would also far outweigh any harm to the Defendant.

### I. Injunctive Relief Will Service the Public Interest

It is a well-settled principle that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring the Government to the follow its procurement statutes and regulations. Issue of an injunction will protect the integrity of the procurement process, and will protect the integrity of the small business programs administered by the SBA, so that large businesses are not permitted to improperly profit from programs meant to benefit legitimate small businesses.

## IV. CONCLUSION

Hardie's respectfully submits that the requested relief is urgently needed to maintain the status quo until the Court reaches a decision on the merits. Based on the foregoing facts and analysis, Hardie's respectfully requests the Court to grant its motion.

Dated: July 18, 2008

Respectfully Submitted,

Johnathan M. Bailey
SBN 24000009

Of Counsel:
BAILEY & BAILEY, P.C.
Milam Building, Suite 711
115 East Travis
San Antonio, Texas 78205-1611
Telephone: (210) 225-7747
Facsimile: (210) 225-8246

Attorneys for Plaintiff
HARDIE'S FRUIT &
VEGETABLE, CO.- SOUTH, LP.

CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above and foregoing Memorandum of Points and Authorities in Support of Plaintiff's Motion for Preliminary Injunction, Application for Temporary Restraining Order and Temporary Restraining Order has been caused to be delivered by Overnight Delivery next business day to the following this 18th day of July, 2008, by the undersigned.

Mr. Frank Holder, Contracting Officer
Defense Logistics Agency
Defense Supply Center Philadelphia
700 Robbins Avenue
Philadelphia, Pennsylvania 19111-5092
**Federal Express # 8652 0945 2950**

Attorney General of the United States
U.S. Department of Justice
1100 L Street, NW, 8th Floor
Washington, DC 20530
**Federal Express # 8652 0945 2960**

Ms. Pamela Mazza
Piliero Mazza, PLLC
888 17th Street, NW, Ste. 1100
Washington, DC 20006
Attorney for M&S Foods, Ltd. Co.
**Federal Express #8652 0945 2971**

JOHNATHAN M. BAILEY