IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| HARDIE'S FRUIT AND VEGETABLE CO. - SOUTH, LP, | § | |
| | § | |
| Plaintiff, | § | No. 08-534C |
| | § | (Judge Robert H. Hodges, Jr.) |
| vs. | § | |
| | § | |
| THE UNITED STATES | § | |
| | § | |
| Defendant. | § | |

STATEMENT OF FACTS

Hardie's Fruit & Vegetable Co. – South, L.P. ["Hardie's"] pursuant to RCFC 56.1 hereby submits the following Statement of Uncontroverted Material Facts:

1. On July 24, 2006, Solicitation number SPM300-06-R-0008 ["the Solicitation"] was issued for fresh produce supply to a large number of Government facilities divided into a number of geographic zones. AR 1268.

2. The Solicitation was issued as a small business set-aside reserved exclusively for competition among small businesses. AR 1268.

3. The North American Industrial Classification System ["NAICS"] Code assigned to the procurement was NAICS 424480, entitled Fresh Fruit and Vegetable Merchant Wholesalers. AR 738.

4. The size standard associated with that code is 500 employees. AR 738.

5. Because the agency had concerns regarding whether fresh produce of all types required under the Solicitation would be available from Small Business growers

and processors, the Government sought a waiver of the non-manufacturer rule prior to issuing the Solicitation. AR 989.

**Request for Non-Manufacturer Waiver**

6. By letter dated February 9, 2006, Mr. Michael McCall, Associate Director of Small Business of the Defense Logistics Agency, Defense Supply Center Philadelphia ["DSCP"] submitted to Ms. Karen Hontz, Associate Administrator for Government Contracting at the U.S. Small Business Administration ["SBA"] a request for a waiver of the non-manufacturer rule with respect to the Solicitation. AR 989.

7. That request stated the purpose and scope of that request as follows:

> The proposed solicitation is a total small business set aside. Based on market research and acquisition history, the Contracting Officer has determined that small business distributors will be unable to obtain the entire line of perishable produce from small businesses due to product variety and availability in the marketplace.

AR 989.

8. This request makes no mention of any of the services to be provided under the Solicitation such as warehousing or delivery. AR 989. It simply observes that the product itself cannot be obtained by the offeror distributors from small business sources alone. AR 989.

9. Mr. McCall's request was supported and further defined by a memorandum prepared by Mr. Steven Merch, a DSCP Contracting Officer, which outlined the scope of the waiver request and the market research supporting that request. AR 993-999.

10. Mr. Merch's memorandum provided the following findings and conclusions:

> In accordance with FAR 19.102 (f) (5), the Defense Supply Center Philadelphia (DSCP) hereby requests the SBA to transfer the Non-manufacturer Rule waiver covering the requirements of SPM300-06-R-0007 to SPM300-06-R-0008 and the approve a waiver the Non-manufacturer Rule for the various Fresh Fruit and Vegetable items required for support of troops and USDA schools in the geographic areas covered in section 1) below. While DSCP does not anticipate supporting commissaries under this acquisition, it reserves the right to provide such support should it become necessary. It is the intent of DSCP to continue to purchase these items from small business produce distributors. Market Research indicates that while numerous small business distributors exist to potentially support these customers, none of these distributors carry product solely grown and processed by small businesses.

AR 993-999.

11. SBA granted the request for a non-manufacturer waiver for purchase of product under the Solicitation by letter dated March 16, 2006. AR 1000. That letter stated in pertinent part:

> The waiver of the non-manufacturer rule on an individual procurement is provided for in Public Law 101-574, Section 210. We have reviewed your request and accept your determination that there are no small business manufacturers capable of providing the depth and breadth of products needed for the troops and the USDA schools that meet the Government's specifications.
>
> A waiver of the Non-manufacturer Rule is hereby established for the purchase to cover the full line of various fresh fruits and vegetables in the PPV, under contract number SPM300-06-R-0008. This waiver is based on current information, and information supplied to us indicating that there are no known small business manufacturers that can supply the depth and breadth of products required by the Government. However, it must be emphasized that this waiver of the Non-manufacturer Rule does not waive other Government-wide

> requirements applicable to Government procurements such as the Buy American Act.
>
> This waiver covers the purchase of the item(s) for the duration of the contract, including options years, and does not apply to contract modifications or other procurement actions.

AR 1001.

**Acquisition Plan**

12. The Acquisition Plan at AR Tab 1, prepared as part of the Solicitation planning process, also discussed the purpose and scope of the non-manufacturer-waiver that the agency requested, stating:

> Each zone will initially be set-aside for small businesses. Prior to this determination, DSCP requested a waiver of the non-manufacturer rule from the Small Business Administration (SBA). Knowledge of the industry and market research confirm that produce is supported by both small and large businesses. Additionally, some brand name product, such as Dole and Fresh Express are large businesses and any purchase of non-domestic product (bananas) would come from other small businesses. Based on these facts, DSCP petitioned and received from SBA a waiver of the non-manufacturer rule for each zone. The SBA, DSCP Small Business Office and a DLA policy analyst examining this situation all concur that assuming some type of Berry Amendment relief is obtained by DSCP for FF&V, the waiver allows for the small contractor to purchase product from a non-domestic source. While the Government anticipates receiving competition from small businesses in each zone it reserves the right to dissolve the set-asides on a zone by zone basis should conditions warrant.

AR 007-8.

**Contract Management Plan**

13. The Contract Management Plan prepared by the Government as part of the Solicitation development process at AR Tab 4 provided that there would be three major performance metrics that measured any successful contractor's performance:

> Three major performance metrics, Fill-Rate, On-Time Delivery and Customer Satisfaction, will be monitored to assist the evaluation process for exercising an option.
>
> Fill-Rate – vendors will be contractually required to meet a minimum fill-rate without substitutions of 98%. Monitoring will be done via monthly management reports submitted by vendor and customer feedback.
>
> On-Time Delivery - vendors are expected to make all delivered on-time. Performance will be monitored via monthly management reports submitted by vendor and customer feedback.
>
> Customer Satisfaction- customer satisfaction will be formally monitored via customer surveys. Surveys will be sent out three (3) months after contract start-up and every six (6) months thereafter. Satisfaction will be measured on a scale of 1 (lowest) through 5 (highest) and will specifically examine product quality, on-time delivery, fill-rate, product substitutions and overall customer service. Minimum acceptable level for each of these categories is a rating of "3".

AR 52-53.

**Solicitation Terms**

14. The objective of the Solicitation was to enter into long-term contracts with commercial firms to supply a full line of USDA No.1 or better quality Fresh Fruit and Vegetable (FF&V) products to Department of Defense (DoD) Troop Issue customers and non-DoD customers to include Job Corps and USDA Supported Customers (Schools and Indian Tribal Organizations). AR 1280.

15. The range of entities to be serviced were divided into three major groupings: 1) Group 1 - DoD & other non-USDA School Customers, 2) Group 2 - USDA School Customers, and 3) Group 3 - DoD Export. AR 1280.

16. The services to be provided under the Solicitation were also broken down geographically into 12 Regions and 43 zones. AR 1280-1281.

17. The Solicitation was set aside 100% for exclusive small business competition. AR 1281.

18. As noted in the Solicitation, the U.S. Small Business Administration ["SBA"] issued a waiver of the Non-manufacturer Rule (13 CFR § 121.406) thereby allowing small business receiving the award under a small business set-aside to "procure products from large businesses." AR 1281.

19. The resulting contracts awarded under the Solicitation were to be indefinite delivery, indefinite quantity contracts with Economic Price Adjustment provisions based upon cost of materials. AR 1281.

20. Each contract was to provide for an indefinite quantity, within stated limits, of specific supplies or services to be furnished during a fixed period, with deliveries to be scheduled by placing orders with the contractor pursuant to FAR Part 16. AR 1283.

21. These contracts were to be for an 18-month base term with three 18-month option periods, with a maximum period of 72 months (6 years). AR 1283.

22. The Solicitation provided estimated values for each zone. AR 1281-1282.

23. The Solicitation contained a number of very specific primary and vital services which any successful offeror must be capable of performing at any of the listed locations:

## XIII. DELIVERY INSTRUCTIONS

A. Vendors shall ensure all products are delivered in sanitary trucks that are of a commercially acceptable standard. All trucks shall maintain proper temperatures, as determined through standard commercial practices.

B. Deliveries shall be F.O.B. destination to all ordering activities and delivery points. All items will be delivered to customer locations, free of damage, with all packaging and packing intact.

The contractor shall remove all excess pallets used for delivery from the delivery point. A listing of all the delivery points per zone can be found at: http://www.dscp.dla.mil/subs/produce/pv/region.htm

C. Troop installation & USDA delivery schedules (days and times) routes and stop-off sequence will be coordinated and verified with the customers on a post award basis by the awardee(s).

In general, each Troop customer receives three (3) deliveries per week and each USDA customer receives one (1) delivery per week.

D. Products for individual customers/dining facilities must be segregated. Many of the military bases have more than one delivery point. All product shall be segregated by drop-off point and loaded into the delivery vehicle in reverse drop sequence. The intent is to provide expeditious off-loading and delivery to the customer.

E. The offeror shall also ensure that the personnel loading and delivering the product provide prompt and efficient service to the customer.

## XIV. INSPECTION AND ACCEPTANCE

A. Inspection and Acceptance of products will be performed at destination. The inspection is normally limited to identity, count and condition; however, this may be expanded if deemed necessary by either the military Veterinary Inspector, Dining Facility Manager, Food Service Advisor/Officer, or the Contracting Officer. Delivery vehicles may be required to stop at a central location for inspection

before proceeding to the assigned delivery point(s). In addition, the delivery vehicles will be inspected for cleanliness and condition. Supplies transported in vehicles that are not sanitary, or which are not equipped to maintain prescribed temperatures, may be rejected without further inspection.

B. The authorized receiving official at each delivery point is responsible for inspecting and accepting products as they are delivered. The delivery ticket shall not be signed prior to the inspection of each product. All verages/shortages/returns are to be noted on the delivery ticket by the receiving official and truck driver. The authorized receiving official's signature on the delivery ticket denotes acceptance of the product.

C. The contractor shall forward three (3) copies of the delivery ticket with the shipment. The receiving official will use the delivery ticket as the receipt document. Two (2) copies of the signed and annotated delivery ticket will serve as the acceptance document. No electronic invoice may be submitted for payment until acceptance is verified. Additionally, upon completing the delivery (or deliveries) and before the carrier leaves the installation, copies of the invoices may be required to be delivered to a central "Accounting/Troop Issue" activity on the installation.

AR 1287.

24. The Solicitation requires with respect to offeror capacity and facilities:

**XI. ITEM AVAILABILITY**

A. Vendors must have access to items in sufficient quantities to fill all ordering activity requirements. It is critical that items ordered be routinely delivered on a "skip day" basis, at a minimum.

B. Vendors shall notify the customer within 24 hours of order placement of the non-availability of any item. Vendors shall offer the customer a substitute of equal or higher quality and at an equal or lower cost, or advise them of the not-in-stock position of the item. Substituted product shall not be delivered without prior consent by the customer. Substituted items must be noted as such on the invoice.

AR 1287.

25. The Solicitation requires with respect to offeror packaging, packing, labeling and marking:

> **XII. PACKAGING, PACKING, LABELING AND MARKINGS**
>
> A. All packaging and packing shall be in accordance with good commercial practice. Labeling shall be in accordance with commercial labeling complying with the Federal Food, Drug and Cosmetic Act and regulations promulgated there under. Shipping containers shall be in compliance with the National Motor Freight Classification and Uniform Freight Classification Code.
>
> B. To ensure that the carrier and the receiving activity properly handle and store items, standard commercial precautionary markings such as "KEEP REFRIGERATED" shall be used on all cases when appropriate.
>
> * * *

AR 1287.

26. The Solicitation requires with respect to offeror warehousing, sanitation, and stored product pest management:

> **XXIV. WAREHOUSING AND SANITATION PROGRAM/STORED PRODUCT PEST MANAGEMENT**
>
> The contractor shall develop and maintain a sanitation program and a stored product pest management program for food and other co-located non-food items that comply with industry standard programs such as the Code of Federal Regulations, Title 21, part 110, Food Manufacturing Practices, the Federal Insecticide, Fungicide and Rodenticide Act, the Food, Drug, and Cosmetic Act of 1938 as well as all pertinent state and local laws and regulations. Records of inspections performed by the firm, subcontractor, or recognized industry association shall be maintained and made available to the Government at the Contracting Officer's request. Any findings by the firm or its agent documenting a critical sanitation deficiency shall be reported immediately to the Contracting Officer with an attached report of corrective action.

* * *

AR 1292.

27. The Solicitation requires with respect to offeror force protection:

> **XXX. FORCE PROTECTION**
>
> DSCP Subsistence Directorate provides world-wide subsistence logistics support during peace time as well as during regional conflicts, contingency operations, national emergencies, and natural disasters. At any time, the United States Government, its personnel, resources and interests may be the target of enemy aggression to include espionage, sabotage, or terrorism.
>
> This increased risk requires DSCP to take steps to ensure measures are taken to prevent the deliberate tampering and contamination of subsistence items. The offeror must ensure that products and/or packaging have not been tampered with or contaminated throughout the growing, storage, and delivery process. The offeror must immediately inform DSCP Subsistence of any attempt or suspected attempt by any party or parties, known or unknown, to tamper with or contaminate subsistence supplies.
>
> As the holder of a contract with the Department of Defense, the awardees should be aware of the vital role they play in supporting our customers. It is incumbent upon the awardees to take all necessary actions to secure product delivered to all military customers, as well as any applicable commercial destinations.

AR 1293.

28. The Solicitation requires with respect to offeror support for surge or mobilization requirements:

> **XXXI. SURGE/MOBILIZATION**
>
> 1. *Surge*: The capability to handle a large increase in case volume for short periods of time with very little lead-time may be required at various times throughout the term of the contract.

> Services may experience unscheduled arrival of troops, with only a few hours notice, as part of normal operations, where the order requirements could more than double from their normal usage on a given days notice. The timing of these types of surges will be impossible to anticipate. Pricing for items furnished in this fashion shall be the same as those for routine, SPM300-06-R-0008 Page 21 of 78 non-surge orders.
>
> 2. *Mobilization:* Offeror must be capable of support a tripling of ordering requirements for an extended period of time in the event of a full-scale military mobilization or national emergency. As with surge support, pricing for items furnished in this fashion shall be the same as those for routine, non-mobilization orders.
>
> 3. When units deploy for training exercises outside their zone, their current vendor will be given the opportunity to supply the unit's requirements. If the current vendor cannot perform this function at no additional cost, or the Vendor does not wish to accept the mission, the requirements will be turned over to the vendor supporting the zone in which training will occur.

AR 1293- 1294.

29. The Solicitation evaluation criteria, which identifies those aspects of the proposals and the contract, which are most important to the agency in making an award decision, were divided into four major factors. AR 1342.

30. These major factors listed in descending order of importance: Quality Assurance/ Product Quality, Past Performance/ Corporate Experience, Distribution Plan, And DLA Mentoring Business Agreements (MBA). AR1342.

31. Factor 1, Quality Assurance/ Product Quality was defined in the Solicitation as follows:

> 1.1 The Government will assess the offeror's overall audit ratings. The Government will review the reports to assess the effectiveness of a firm's food safety and pest controls measures, to uncover any critical findings and ascertain the

> offeror's ability to correct deficiencies. The Government will also confirm firm holds a current PACA license.
>
> 1.2 The offeror's inventory turnover ratio will be analyzed as a metric indicating the level of freshness of the products delivered.
>
> 1.3 The Government will assess the offeror's temperature and humidity controls as a metric in maintaining quality fresh produce. Assessment will include the number of different zones and monitoring procedures.

AR 367.

32. Factor 2, Past Performance/ Corporate Experience was defined in the Solicitation as follows:

> 2.1 The government will evaluate the offeror's record of recent contractual performance on high dollar value accounts. The Government will evaluate the offeror's experience on contracts similar in size and scope to the corresponding zone requirements.
>
> 2.2 The offeror's Corporate Experience will be evaluated to determine that the offeror possesses an appropriate level of experience to handle the demands of the corresponding zone.

AR 367.

33. Factor 3, Distribution Plan, was defined in the Solicitation as follows:

> The Government will evaluate the offeror's ability to adequate support the number and frequency of deliveries required under the corresponding zone.

AR 367.

34. Factor 4, DLA Mentoring Business Agreements (MBA) was defined in the Solicitation as follows:

> The responses from offerors on the MBA Program will be evaluated on a comparative basis amongst all offerors. The offeror(s) indicating the most comprehensive plan(s) will

> receive the highest rating; this rating will be further enhanced if the offeror identifies new business ventures rather than expansion of existing agreements. This evaluation will also be used to determine the offeror's willingness to assist small business, small disadvantaged business (SDB), women-owned small business (WOSB), veterans owned small business (VOSB), service disabled veteran owned small business (SDVOSB) and HUB Zone small business in expanding their businesses.

AR 367.

35. Offers under the Solicitation were due on September 21, 2006. AR 1268.

36. Hardie's and M&S both submitted timely proposals. AR 1267-1428 and 1510-1765.

**M&S Technical Proposal**

37. The establishment inspection report and other facilities audits included in M&S's proposal on which the agency's evaluation for M&S' facilities was based, were inspections of Sysco's facilities. AR 1609-1646.

38. The inventory turnover data submitted in M&S' technical proposal was entirely composed of the inventory turnover data of Sysco. AR 1648.

39. For past performance references, M&S submitted five references of its own, plus an additional three references of Sysco, even though the Solicitation permitted only 5 total per offeror. AR 1650-51, AR 1344.

40. M&S' technical proposal represented its relationship with Sysco as follows:

> Our selected subcontractor(s) for this solicitation, FreshPoint, City Produce (in business 26 years) and the operating subsidiaries of Sysco Corporation (in the event of Surge Mobilization) have extensive experience in servicing government and foodservice establishments, including many DSCP facilities both past and present with an outstanding

> track record. FreshPoint is a subsidiary corporation of Sysco Foods.
>
> M&S Foods will be handling the day to day management of this solicitation. We have formed a teaming partnership with FreshPoint, City Produce as our subcontractor.
>
> The agreement with FreshPoint/Sysco Corporation for delivery and warehousing of product purchased for this solicitation gives M&S the unsurpassed ability to provide the best price, highest quality, and superior service thus the best value to DSCP locations. This will include in some cases Sysco operating companies if needed as backup in the event of surge mobilization, all covered under one umbrella agreement again offering DSCP the best value and assurances available in the industry.
>
> **M&S will utilize Sysco as its supplier/shipper. M&S Foods Ltd. Co. is responsible for all accounts payables and receivables incurred in this solicitation.**

AR 1653.

41. M&S' technical proposal, in discussing the capability of itself and Sysco to handle the complex delivery demands of the Solicitation stated as follows:

> As part of their daily routine our teaming partner/subcontractor, FreshPoint, City Produce procure and deliver millions of cases of perishable products. Their customers include some for the largest and most demanding food operators in the world including DSCP. Major hotels, hospitals, white table cloth restaurant, multi unit restaurant chains, and in plant feeding operations depend on their levels of quality and service. M&S Food and city Produce's joint operations facilitate hundreds of perishable cases per day; this has been accomplished with ease for more than 4 years in mentoring and teaming scenarios between our organizations throughout the southeast, Texas and Arkansas.

AR 1654. On this page, M&S lists the "place of performance" as Sysco, not M&S. AR 1654.

42. M&S' technical proposal in discussing customer service indicates that there would be a customer service representative available during the weekdays and on Saturdays, but does not indicate whether M&S itself or Sysco would provide that customer service. AR 1655. M&S also indicates that after hours an 800 number and cell number, as well as email and fax numbers would be available, but does not specify whether those would be M&S or Sysco contact points. AR 1655.

43. M&S' technical proposal heavily emphasizes Sysco's delivery capabilities, but not any of its own:

> M&S Food's subcontractor/ teaming partner FreshPoint, City Produce has prime vendor and local accounts throughout the entire geographical area that encompasses Texas, Zone 4 San Antonio *(see map).* FreshPoint, City Produce has four (4) warehouse strategically located within Zone 4 ensuring A.M. deliveries.
> The zone overlays our current service area; this will allow use to offer DSCP outstanding service, Not additional Fleet resources will be needed by out teaming partner to service DSCP locations indicated in this solicitation.
> The fleet is comprised of 67 truck of assorted size *(please see tables),* on average at 84% load capacity however additional trucks can be purchased or secured from sister operating companies if the need arises.

AR 1655.

44. M&S' proposal in addressing evaluation Factor 3 identifies only warehouses owned and operated by Sysco. AR 1657-1659.

45. M&S' technical proposal also contained a copy of its teaming agreement for the Solicitation with Sysco. AR 1660.

46. The agreement specific that M&S would be prime contractor and Sysco subcontractor. AR 1660.

47. The agreement provided that M&S would "take the lead" in negotiations with the Government, but that "lead" would be "subject to review and approval by City Produce [Sysco]". AR 1660.

48. The agreement provided that M&S would "retain primary control over the responsibility for contract performance," but that this "primary control" was "subject to review and approval by City Produce [Sysco]". AR 1660.

49. The agreement provided that M&S would "submit a prime contract proposal and will be responsible for the final editing, printing and submittal of the necessary proposal documents to the Government," but that this would also be "subject to review and approval of City Produce [Sysco]". AR 1660.

50. The teaming agreement affirmatively stated that M&S was required to award a subcontract to City Produce for supply of all product required by the prime contract. AR 1660.

51. M&S' proposal with respect to the major evaluation factor of DLA mentoring agreements states that M&S has no mentoring agreements, but notes that it was itself mentored by another Sysco affiliate in Central Florida. AR 1668.

52. M&S' proposal with respect to the Solicitation's requirement for Force Protection necessarily focuses entirely on the capabilities of City Produce (Sysco), since all physical facilities and equipment for storing and delivering produce belong to City Produce (Sysco). AR 1670-1672.

53. M&S' proposal with respect to Surge/Mobilization focuses entirely on the capability of City Produce FreshPoint (Sysco) to meet additional surge or mobilization requirement, with no mention of any role of M&S in that effort. AR 1673-1674.

54. M&S proposal with respect to ability to use the Government's electronic ordering system known as STORES also emphasizes its reliance on Sysco, stating:

> M&S Foods has been mentored by Sysco Central Florida and has been trained to interface with STORES and Support:
>
> 832 Catalog outbound to DSCP
> 850 Purchase Order
> 861 Receipts
> 997 Functional Acknowledgements
> 810 Electronic Invoices
>
> M&S food and our subcontractor City Produce can be operational with STORES within 15 days or award notice.
>
> All orders will flow via M&S FOODS EDI systems to our Subcontractors/ Teaming Partners for this solicitation.

AR 1675.

55. All of the invoices or written quotations submitted by M&S in support of its price proposal are invoices from suppliers to Sysco, not one is to M&S. AR 1740-1765.

**M&S/Sysco Past Performance References**

56. The M&S past performance questionnaire for Corpus Christi Naval Air Station, Rio Grande Valley Central Texas Schools and Corpus Area Schools was an evaluation of City Produce (Sysco), and rated Sysco excellent. AR 720.

57. The M&S past performance questionnaire for DSCP Troop Issue – San Antonio bases was an evaluation of City Produce (Sysco), and rated Sysco excellent. AR 721.

58. The M&S past performance questionnaire for P.E.M.H.S. was an evaluation of M&S' performance, with mixed ratings of "Good" and "Fair". AR 723. The individual who completed the questionnaire also noted "They are just the "middle man." AR 723.

**M&S' Price Proposal**

59. The supplier invoices submitted in support of M&S' pricing proposal are directed to City Produce (Sysco) or the Sysco parent company, not M&S. AR 1172-1235.

60. The payment information submitted by M&S in its proposal for remittance of contract payments lists the following remittance information for M&S: M&S Foods LTD. CO., Attn: Drew Yurko, 1390 Enclave Parkway, Houston Texas, 77077. AR 1528. The address 1390 Enclave Parkway, Houston, Texas 77077 is the address of Sysco's main corporate headquarters as stated on Sysco's own website. AR 898.

61. M&S's proposal also lists Mr. Drew Yurko as M&S' Accounts Receivable Point of Contact any resulting contract, and gives an M&S foods email address for Mr. Yurko, conveying the impression that Mr. Yurko is an M&S employee. AR 1528.

62. Mr. Yurko is the Vice-President and Chief Financial Officer of FreshPoint (Sysco).

63. Mr. Yurko was not disclosed by M&S as an M&S officer or employee in the sworn SBA form 355 submitted by M&S in response to the size protest. AR 1046.

64. Mr. Yurko was not disclosed by M&S as a common employee between M&S and Sysco in response to a direct question regarding common employees in the sworn SBA form 355 submitted by M&S in response to the size protest. AR 1046.

65. Question 17 on the SBA form 355 submitted by M&S asked, "At the time of bid opening or application for assistance, did applicant share any facilities, equipment, or personnel with any of the alleged, acknowledged, or possible affiliates?",

to which M&S responded "No." AR 1048. M&S' proposal shows this answer to be incorrect. AR 1528.

66. Question 18 on the SBA form 355 submitted by M&S asked, "In preparing the subject bid or application for assistance, was any assistance provided by an alleged, acknowledged or possible affiliate to the applicant or by the applicant to an alleged, acknowledged or possible affiliate?" to which M&S responded "No." AR 1048. This answer directly contradicts M&S' own proposal which is replete with content provided by Sysco. AR 01741-01765.

67. Question 12 on the SBA form 355 submitted by M&S asked M&S to disclose its total sales or receipts for the previous three completed fiscal years. AR 1047. M&S listed $242,647 for 2004, $479,848 for 2005 and $236,173 for 2006. AR 1047. M&S's proposal, however, claims more than $7,000,000.00 in annual sales. AR 1129.

**<u>Evaluation of M&S' Technical Proposal</u>**

68. The record indicates that with respect to Factor 1 and Factor 3 of the evaluation of those factors was based entirely upon Sysco's warehouse and distribution capabilities, and not any of M&S. AR 602.

69. Factor 2 was to be based upon both M&S and Sysco's past performance combined.

70. The evaluation record shows that M&S score of "Good" for subfactor 1.1 was based entirely upon inspections and audits of Sysco's facilities in Austin, Corpus Christi, Harlingen and San Antonio, Texas. AR 605.

71. For subfactor 1.2, the agency's evaluation of M&S' proposal was again based entirely upon Sysco's record of inventory turnover. AR 607.

72. For subfactor 1.3, the agency's evaluation of M&S' proposal was again based entirely upon Sysco's record of temperature and humidity controls, as the warehouses all belong to Sysco. AR 609.

73. The agency's evaluation of M&S' proposal under Factor 2 – Past Performance, subpart 2.1 was based equally upon the past performance records of both M&S and Fresh Point. AR 612. Notably, although the Solicitation limited offerors to submission of 5 past performance references, M&S was essentially allowed to submit 10- five from M&S and five from Sysco. AR 612.

74. The agency's evaluation of M&S' proposal under Factor 2 – Past Performance, subpart 2.1 was based equally upon the past performance records of both M&S and Fresh Point. AR 615. In fact, it appears that M&S received a score of "Excellent" solely because Sysco had total volume of sales that "greatly exceeded" the value of Zone 4 dollar estimate, which was a requirement to receive that score. AR 614 and 615.

75. The agency's evaluation for M&S' proposal under Factor 3 – based entirely upon the capabilities of Sysco, stating:

> The Offeror has provided detailed warehouse and delivery fleet information.
>
> **Warehousing:** FreshPoint – City Produce has a total of 104,800 sq feet of cooler space and at any given time the current FF&V inventory could be tripled without increasing current run rate. FresshPoint- City Produce has four (4) warehouses covering the entire Zone. The supplier has prime vendor and local account throughout the entire geographical area that encompasses Zone 4. The Offeror

> states that "The value of this contract can be handled with no adverse effect on available warehouse space." The Offeror state that new additional warehouse space in San Antonio is to be completed on Nov-Dec 2006. Additional sq footage is not provided.
>
> **Delivery Fleet:** FreshPoint- City Produce had a fleet comprised of 67 trucks of assorted sizes. The fleet is presently at 84% capacity. It is stated by M&S Foods that "No additional fleet resources will be needed by out teaming partner (FreshPoint-City Produce) to service the DSCP locations indicated in this solicitation." It is also stated that "additional trucks can be purchased or secured from sister operating companies if the need arises."
>
> It should be noted that the sub-contractor (FreshPoint) is a subsidiary of Sysco Foods. It is indicated that Sysco Corp.'s operating subsidiaries would be utilized as back up n the event of a surge/ mobilization situation.

AR 619.

76. The agency's evaluation of M&S' proposal with respect to DLA mentoring agreements showed the M&S had no such agreements. AR 621.

## Evaluation of Hardie's Technical Proposal

77. Hardie's ratings for all evaluation factors were based solely on Hardie's own capabilities as an experienced small business with 62 years as a full-line FF&V distributor. AR 627-648.

78. Hardie's did not propose to use any subcontractor to perform any of the primary and vital functions required by the Solicitation. AR 1267 - 1509.

**Evaluation of Price Proposals**

79. For the purpose of evaluating price proposals, each offeror was directed to submit prices for a "market basket," a collection of frequently ordered items selected to give the Government a common basis for comparison of prices and price markup. AR 61-62.

80. The methodology for development of the market basket was as follows:

> The market basket for each zone was comprised in the following manner. A database containing one-year sales figures for each individual item was developed for each zone. From each database the top dollar value items were selected in descending dollar value until 75% of the total dollar value sales was represented. In order to ensure a breadth of items would be covered in each zone, each initial list of items was matched up against a list of top 25 FF&V groups of items (i.e. apples, bananas, lettuce, etc.) This top 25 list was comprised by taking the top 500 items ordered throughout the Produce Division (excluding DeCA Sales), placing each item into its respective group (i. e. apple, banana, lettuce, etc.) From this master list, the top 25 item group list was formed. For any group of times not initially represented in the top 75%, the top sales item for that group was added to the market basket.
>
> Sub-Factor 1.1 – Market Basket Evaluation
>
> Each item will be evaluated by multiplying the unit price* by the estimated quantity to arrive at the total price for each item. The total price for each item will be summed to arrive at the aggregate market basket. The same process will apply to each of the three option period. The four (4) totals will then be summed together. This total market basket price will then be comparatively assessed against other offerors.
>
> *Unit price = Delivered Price + Distribution Price. Each offeror is permitted to submit a distribution price for each Group of customers as defined by the solicitation. One will be the standard distribution price for all categories of items for Group 1 and the other will cover the standard distribution price for Group 2. Offerors can submit the same distribution price for both Groups of customers. Each distribution price shall be a case price. The two distribution prices will be combined to provide a weighted average for evaluation purposes only. The weighted distribution price will be the distribution price utilized by the vendor when

> filling out the market basket. The weights will be determined by the estimated percentage of dollar value sales for each group of customers and are provided to the offerors in the solicitation.

AR 649

81. The market basket in the instant evaluation included 62 produce items which represented 75% of the estimated dollar value of the procurement. AR 661.

82. For each item in the market basket, the offeror's price would be evaluated with respect to the "unit price" of the item. AR 649.

83. The "unit price" of the item is equal to its "delivered price" plus the "distribution price". AR 649.

84. The "delivered price" is the cost of the product itself, and was to be supported with product invoices or written quotes from the grower/supplier. AR 363-364.

85. In the evaluation of price proposals, the price evaluator noted the following with respect to M&S' submission for the market basket:

> On all items: M&S provided invoices billed to City Produce. The relationship between City Produce and M&S is unknown to this analysis but should be addressed by the Contracting Officer.

AR 662.

86. Therefore, City Produce provided 100% of the quotations for produce items in M&S' market basket proposal submission. AR 662.

## Competitive Range Determination

87. Tab 14 of the administrative record contains the Competitive Range Determination for the San Antonio Zone. AR 370.

88. The Competitive Range Determination notes with respect to the evaluation of M&S' proposal:

> **NOTE:** M&S submitted, with its offer, a signed legally binding subcontracting/ teaming partner agreement with Fresh Point, City Produce outlining their relationship to support the requirement. Since the proposed place of performance is City Produce Fresh Point – all the quality elements addressed in Factor 1 and Factor 3 of the technical proposal are based upon City Produce Fresh Point's warehouse and distribution capabilities. Factor 2 will be based upon both M&S and City Produce Fresh Point's Past Performance/ Corporate Experience due to M&S doing the purchasing, pricing and catalog maintenance for this zone. Therefore, M&S was evaluated for Factor 2, Past performance. Corporate History and FreshPoint/ City Produce was evaluated for Factors 1 thru 4.

AR 371.

89. In the Pre-negotiation Briefing Memorandum document at AR Tab 16, the agency expressed significant reservations about the propriety of M&S' heavy reliance upon City Produce (Sysco):

> The relationship between M&S Fresh Point/City Produce, a subsidiary of Sysco, poses problems in that this acquisition is set-aside for small business and yet M&S is subcontracting out 100% of the storage and delivery for this solicitation and in some cases the purchasing. CFR Section 121.103 (h) (4) reads:
>
> A contractor and its ostensible subcontractor are treated as joint venturers, and therefore affiliates, for size determination purposes. An ostensible subcontractor is a subcontractor that performs primary and vital requirements of a contract, or of an order under a multiple award schedule contract, or a subcontractor upon which the prime contractor is unusually reliant. All aspects of the relationship between the prime and subcontractor are considered, including, but not limited to, the terms of the proposal (such as contract management, technical responsibilities, and the percentage of subcontracted work), agreements between the prime and subcontractor (such as bonding assistance or the teaming

> agreement), and whether the subcontractor is the incumbent contractor and is ineligible to submit a proposal because it exceeds the applicable size standard for the solicitation.
>
> The Contracting Officer has been in contact with the DSCP small business office and the Small Business Administration seeking guidance on whether subcontractors in this type of instance truly represents a small business offer. The SBA has no known ruling in such an instance when a waiver of the Non-Manufacturer Rule has been issued. The SBA stated it would only review the size determination if the firm in question, in this case M&S, is the proposed awardee and the Contracting Officer files a protest. The Contracting Officer anticipates filing such a protest should M&S be selected for award.

AR 443.

90. In January 2008, during evaluation of the proposals, a question arose in the mind of the agency evaluators as to how M&S would distribute orders among its subcontractors, and whether there would be administrative delay. AR 461.

91. Ms. Debbie Goffman of DSCP contacted M&S to pose that question and summarize M&S' response in an email dated January 16, 2008, to the contracting officer which states:

> I spoke with Ty Walker from M&S and he said that all purchase orders will go to M&S directly and they would then be forwarded multiple times per day, if necessary, to FreshPoint. A full-time M&S employee will be at the San Antonio Warehouse also. He stated that there would not be any lag time in receiving orders and that M&S would be in constant contact with Fresh Point. M&S is currently using the STORES system for the Government Grocery business and are set up for all of the transaction sets needed for implementation which is a plus for a smooth implementation.
>
> As stated in the PNM, M&S will be responsible for all purchasing, pricing, catalog maintenance, accounts receivable and accounts payables for products utilized in this solicitation.

> I feel fairly confident in speaking with Ty Walker, President of M&S, that they fully understand the ordering and delivery process. Mr. Walker also stated that Fresh Point would be doing 100% of the deliveries, that there would be no other subcontractors.
>
> The main concern I have is the small business issue – if Fresh Point will be considered "small" since they are a subsidiary of Sysco.

AR 462.

## Award

92. On March 12, 2008, Hardie's received a letter from the Defense Logistics Agency, Defense Supply Center Philadelphia ["DSCP"] announcing that award under the Solicitation would be made to M&S Foods, Ltd., Co. ["M&S Foods"] for the San Antonio Zone. AR 0507.

## M&S Foods, Ltd.

93. M&S Foods, Ltd. has its principal office in Newberry, Florida. M&S performs food distribution contracts to public facilities in the State of Florida through subcontracting relationships with large business food distributors identified on its corporate website. AR 879 and 890.

94. M&S owns no warehouse or other produce storage facilities in the State of Texas. AR 880.

95. M&S does not own any distribution facilities or vehicles in the State of Texas. AR 880.

96. M&S must rely entirely upon the supply and distribution capabilities of a subcontractor to perform this contract, as it only has at most the ability to process orders and billing with its own resources. AR 880.

97. M&S was previously awarded certain interim contracts for this requirement starting December, 2006, for interim coverage at Fort Hood, Texas while award under the present Solicitation was pending. AR 880.

98. M&S' apparently successful proposal on that contract was based upon a subcontract with Fresh Point-City Produce LP, a wholly-owned subsidiary of Sysco Corporation ["Sysco"]. AR 880.

## City Produce is Sysco Corporation

99. Throughout the record, and in M&S' own proposal, reference is made to entities with the names "City Produce", "Freshpoint" and "Sysco". AR 619 and 1653.

100. All of these entities are owned and controlled by Sysco Corporation.

101. Sysco Corporation is a fortune 500 company with more than 45,000 employees.

102. Under filing number 800601820, "Fresh Point" is the Assumed Name of a foreign limited partnership formed in Delaware. AR 880 and 895.

103. The official name of Fresh Point is Fresh Point – City Produce LP. AR 880 and 896.

104. The General Partner of Fresh Point – City Produce LP is FreshPoint, Inc. AR 880 and 897.

105. FreshPoint, Inc. is a wholly-owned subsidiary of Sysco Corporation. AR 880 and 899-901.

106. In the Texas Franchise Tax information return for FreshPoint – City Produce LP, the address is listed as 1390 Enclave Parkway, Houston Texas 77077. AR 880 and 903.

107. The same address is used for Sysco Corporate Offices in Houston, Texas. AR 880 and 898.

Dated: August 22, 2008

Respectfully Submitted,

Johnathan M. Bailey
SBN 24000009

Of Counsel:
BAILEY & BAILEY, P.C.
Milam Building, Suite 711
115 East Travis
San Antonio, Texas 78205-1611
Telephone: (210) 225-7747
Facsimile: (210) 225-8246

Attorneys for Plaintiff
HARDIE'S FRUIT &
VEGETABLE, CO.- SOUTH, LP.