IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| HARDIE'S FRUIT AND VEGETABLE CO. - SOUTH, LP, | § | |
| | § | |
| Plaintiff, | § | No. 08-534C |
| | § | (Judge Robert H. Hodges, Jr.) |
| | § | |
| vs. | § | |
| | § | |
| THE UNITED STATES | § | |
| | § | |
| Defendant. | § | |

PLAINTIFF'S CORRECTED MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT UPON ADMINISTRATIVE RECORD

JOHNATHAN M. BAILEY
THEODORE M. BAILEY, P.C.
115 East Travis Street , Suite 711
San Antonio, Texas 78205-1611
Telephone: (210) 225-7747
Facsimile: (210) 225-8246

Dated: September 3, 2008

TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

I. QUESTIONS PRESENTED .......... 1

II. STATEMENT OF THE CASE .......... 2

III. ARGUMENT .......... 11

A. Standard for Grant of Judgment on the Administrative Board .......... 11

B. Standard of Review .......... 11

C. The Area Office's Decision was Correct .......... 12

1. How Does SBA Determine the Size of a Company .......... 12

2. How Does SBA Determine the Size of a Manufacturing Company 13

3. Determining the Number of Employees of a Company .......... 14

4. What is an "Affiliate"? .......... 15

5. Sysco is an Affiliate of M&S .......... 16

a. Common Management .......... 16

b. Joint Venture – The "Ostensible Subcontractor Rule" .......... 17

c. Primary and Vital Requirements .......... 21

d. Undue Reliance .......... 23

6. Effect of Affiliation .......... 24

D. The Area Office's Determination .......... 24

E. Non-Manufacturer Waiver .......... 25

1. "Class Waivers" v "Individual Waivers" .......... 28

2. The Agency's Waiver Request was Narrow and did not Include Warehousing and Delivery .......... 29

IV. CONCLUSION ........................................................................................................ 31

# TABLE OF AUTHORITIES

## Statutes

5 U.S.C. §706 .......... 11
15 USC § 637 .......... 13

## Regulations

13 CFR § 121.103 .......... 15, 17
13 CFR § 121.106 .......... 14
13 CFR § 121.1201, et. seq .......... 28
13 CFR § 121.201 .......... 13
13 CFR § 121.406 .......... 24, 25, 26, 28
13 CFR § 134.314. .......... 12

## Cases

Analytical & Research Tech., Inc. v. United States, 39 Fed. Cl. 34 (1997) .......... 11
Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) .......... 11
Jay v. Secretary of Dept. of Health and Human Serv., 998 F.2d 979 (Fed. Cir. 1993) .......... 11
Nickerson v. United States, 35 Fed. Cl. 581 (1996) .......... 11
Peerless Chain Company, SBA No. SIZ-4784 (2006) .......... 14
The H. L. Turner Group, Inc., SBA No. SIZ-4896 (2008) .......... 15
TKTM Corporation, SBA No. SIZ-4885 (2008) .......... 19

## I. QUESTIONS PRESENTED

1. Did the SBA Office of Hearings and Appeals err in finding that the size determination of the Area Office in this case contained clear errors of fact and/or law?

## II. STATEMENT OF THE CASE

On July 24, 2006, Solicitation number SPM300-06-R-0008 ["the Solicitation"] was issued by the Defense Logistics Agency, Defense Supply Center Philadelphia for supply of fresh produce supply to a large number of Government facilities divided into a number of geographic zones. PFF 1.

The Solicitation was issued as a small business set-aside reserved exclusively for competition among small businesses. PFF 2. The North American Industrial Classification System ["NAICS"] Code assigned to the procurement was NAICS 424480, entitled Fresh Fruit and Vegetable Merchant Wholesalers. The size standard associated with that code is 500 employees. PFF 3-4.

Because the subject procurement was classified as a manufacturing contract, applicable SBA regulations required that to be considered a bona fide small business, *inter alia,* a firm had to grow the produce itself or purchase the produce from only small business growers. As discussed in the legal argument *infra*, this requirement is called the nonmanufacturer rule.

Given the nature of the fresh produce industry, agency had concerns regarding whether fresh produce of all types required under the Solicitation would be available from exclusively small business growers. PFF 5. Accordingly, during the Solicitation development process, the Government sought a waiver of the nonmanufacturer rule prior to issuing the Solicitation. PFF 5.

By letter dated February 9, 2006, Mr. Michael McCall, Associate Director of Small Business of the Defense Logistics Agency, Defense Supply Center Philadelphia ["DSCP"] submitted to Ms. Karen Hontz, Associate Administrator for Government

Contracting at the U.S. Small Business Administration ["SBA"] a request for a waiver of the non-manufacturer rule with respect to the Solicitation. That request stated the purpose and scope of that request as follows:

> The proposed solicitation is a total small business set aside. Based on market research and acquisition history, the Contracting Officer has determined that small business distributors will be unable to obtain the entire line of perishable produce from small businesses due to product variety and availability in the marketplace.

PFF 6-7.

This request made no mention of any of the services to be provided under the Solicitation such as warehousing or delivery, or any other aspect of performance other than the size of the growers from whom produce would be purchased. PFF 8.

Mr. McCall's request was supported and further defined by a memorandum prepared by Mr. Steven Merch, a DSCP Contracting Officer, which outlined the scope of the waiver request and the market research supporting that request. PFF 9. Mr. Merch's memorandum provided the following findings and conclusions:

> In accordance with FAR 19.102 (f) (5), the Defense Supply Center Philadelphia (DSCP) hereby requests the SBA to transfer the Non-manufacturer Rule waiver covering the requirements of SPM300-06-R-0007 to SPM300-06-R-0008 and the approve a waiver the Non-manufacturer Rule for the various Fresh Fruit and Vegetable items required for support of troops and USDA schools in the geographic areas covered in section 1) below. While DSCP does not anticipate supporting commissaries under this acquisition, it reserves the right to provide such support should it become necessary. It is the intent of DSCP to continue to purchase these items from small business produce distributors. Market Research indicates that while numerous small business distributors exist to potentially support these customers, none of these distributors carry product solely grown and processed by small businesses.

PFF 10.

SBA granted the request for a non-manufacturer waiver for purchase of product under the Solicitation by letter dated March 16, 2006. PFF 11. That letter stated in pertinent part:

> The waiver of the non-manufacturer rule on an individual procurement is provided for in Public Law 101-574, Section 210. We have reviewed your request and accept your determination that there are no small business manufacturers capable of providing the depth and breadth of products needed for the troops and the USDA schools that meet the Government's specifications.
>
> A waiver of the Non-manufacturer Rule is hereby established for the purchase to cover the full line of various fresh fruits and vegetables in the PPV, under contract number SPM300-06-R-0008. This waiver is based on current information, and information supplied to us indicating that there are no known small business manufacturers that can supply the depth and breadth of products required by the Government. However, it must be emphasized that this waiver of the Non-manufacturer Rule does not waive other Government-wide requirements applicable to Government procurements such as the Buy American Act.
>
> This waiver covers the purchase of the item(s) for the duration of the contract, including options years, and does not apply to contract modifications or other procurement actions.

PFF 11. Consonant with the request it received, SBA's waiver did not waive or even address any other aspect of contract performance. PFF 12. It simply and only waived the requirement that the produce be purchased from small business growers. PFF3.

After receiving the waiver, the agency proceeded with conduct of the procurement. As part of that process, the agency prepared an Acquisition Plan which discussed the scope of the waiver, and the agency's objective in requesting that waiver, stating:

> Each zone will initially be set-aside for small businesses. Prior to this determination, DSCP requested a waiver of the non-manufacturer rule from the Small Business Administration (SBA). Knowledge of the industry and market research confirm that produce is supported by both small and large businesses. Additionally, some brand name product, such as Dole and Fresh Express are large businesses and any purchase of non-domestic product (bananas) would come from other small businesses. Based on these facts, DSCP petitioned and received from SBA a waiver of the non-manufacturer rule for each zone.

PFF 12 . This again confirms the limited scope of the waiver that DSCP requested and which SBA issued.

The objective of the Solicitation was to enter into long-term contracts with commercial firms to supply a full line of USDA No.1 or better quality Fresh Fruit and Vegetable (FF&V) products to Department of Defense (DoD) Troop Issue customers and non-DoD customers to include Job Corps and USDA Supported Customers (Schools and Indian Tribal Organizations). PFF 14

The range of entities to be serviced were divided into three major groupings: 1) Group 1 - DoD & other non-USDA School Customers, 2) Group 2 - USDA School Customers, and 3) Group 3 - DoD Export. PFF 15. The services to be provided under the Solicitation were also broken down geographically into 12 Regions and 43 zones. PFF 16.

The resulting contracts awarded under the Solicitation were to be indefinite delivery, indefinite quantity contracts with Economic Price Adjustment provisions based upon cost of materials. PFF 19. Each contract was to provide for an indefinite quantity, within stated limits, of specific supplies or services to be furnished during a fixed period, with deliveries to be scheduled by placing orders with the contractor pursuant to FAR

Part 16. PFF 20. These contracts were to be for an 18-month base term with three 18-month option periods, with a maximum period of 72 months (6 years). PFF 21.

The Solicitation contained a number of very specific primary and vital services which any successful offeror must be capable of performing at any of the listed locations including detailed requirements for delivery of produce, inspection and acceptance of produce, maintenance of sufficient inventory to meet contract requirements, packaging and labeling, warehousing and storage of the produce, pest management, force protection, surge and mobilization requirements, and food quality assurance. PFF 23, 24 , 25, 26, 27, 28, 31.

The Solicitation evaluation criteria, which identified those aspects of the proposals and the contract which are most important to the agency in making an award decision, were divided into four major factors. PFF 29. These major factors were listed in descending order of importance: Quality Assurance/ Product Quality, Past Performance/ Corporate Experience, Distribution Plan, And DLA Mentoring Business Agreements (MBA). PFF 30. These aspects of the offerors capabilities and proposed method of performance were therefore identified as the most critical aspects of the offeror's technical proposals.

Both the Plaintiff, Hardie's Fruit and Vegetable Company, Ltd. ["Hardie's] and the Intervenor, M&S Foods, Ltd. ["M&S"] timely submitted proposals in response to the Solicitation. PFF 36.

M&S is a very small produce wholesaler located in Florida. PFF 93. The particular zone to be serviced in the award at issue in the present case is centered around San Antonio, Texas. PFF 92.. M&S has no warehouses or delivery trucks in

Texas (or in Florida for that matter), and therefore simply could not perform the contract with its own efforts. PFF 94,95. It therefore entered into a teaming agreement with City Produce, a wholly owned subsidiary of Sysco Corporation, which is undisputedly a large business. PFF 88,98,105. M&S not only admits but advertises the relationship between itself, City Produce, Sysco and another Sysco subsidiary Freshpoint. PFF 93.

Every aspect of M&S proposal highlights its utter dependence upon City Produce to perform primary and vital aspects of the contract. PFF 68-75. The teaming agreement itself, although nominally empowering M&S to prepare the proposal, negotiate with the Government and manage the resulting contract, each of those decisions made by M&S is subject to review and approval of City Produce. PFF 47,48.

The price proposals in submitted in response to the Solicitation included produce vendor quotations for a selected group of representative items identified in the Solicitation and referred to as the "market basket". PFF 79. M&S' market basket quotations were entirely provided by City Produce, Freshpoint and Sysco. Not a single one of those quotations was directed to M&S by a vendor. PFF 85,86.

Further, M&S' proposal included payment remittance instructions for payments under the contract by the Government, which directed the Government to remit payments to M&S but at an address that belongs to Sysco's corporate headquarters in Houston, Texas. PFF 60. Moreover, the individual to whom those payments are to be directed, and whom M&S' proposal states will be in charge of accounts receivable is Vice President and CFO of Freshpoint, another Sysco subsidiary. PFF 62.

The technical portions of M&S' proposal showed a similar level of near complete reliance upon City Produce. PFF 68,70,71,72,74,75,76. M&S submitted warehouse

inspection reports for City Produce's warehouses, only. PFF 70,75. The inventory turnover data submitted by M&S' was entirely composed of the inventory turnover data of Sysco. PFF 71. M&S' proposal affirmatively stated that City Produce and/or other Sysco companies would be performing all of the supply and delivery functions under the Solicitation. PFF 75.

The only functions which M&S' proposal indicated would be performed by M&S with its own efforts was processing of accounts receivables and payables, which is somewhat suspect when M&S' proposal names a Sysco officer as the point of contact for accounts receivable. PFF 60. M&S also elsewhere indicated that it would provide customer service functions as well. PFF 42.

For past performance references, M&S submitted five references of its own, plus an additional three references of Sysco, even though the Solicitation permitted only 5 total per offeror. PFF 73. Of these, the far better performance evaluations and far larger references were those of City Produce or Sysco, not those of M&S. PFF 74. This is another respect in which M&S was reliant on City Produce/Sysco.

Unsurprisingly, the record indicates that DSCP's evaluation of M&S' technical proposal primarily evaluated the capabilities of City Produce. PFF 68. The evaluation of Factor 1 (Quality) and Factor 3 (Distribution) was based entirely upon City Produce/Sysco's warehouse and distribution capabilities, and not any of M&S. PFF 68 . The agency's evaluation of M&S' proposal under Factor 2 – Past Performance, subpart 2.1 was based equally upon the past performance records of both M&S and City Produce. PFF 73.

By contrast, Hardie's ratings for all evaluation factors were based solely on Hardie's own capabilities as an experienced small business with 62 years as a full-line FF&V distributor. PFF 77. Hardie's did not propose to use any subcontractor to perform any of the primary and vital functions required by the Solicitation. PFF 78.

Internal memorandums prepared by DSCP in the evaluation and negotiation process showed that DSCP personnel had serious concerns about the propriety of M&S' complete reliance upon City Produce/Sysco, noting that:

> The relationship between M&S Fresh Point/City Produce, a subsidiary of Sysco, poses problems in that this acquisition is set-aside for small business and yet M&S is subcontracting out 100% of the storage and delivery for this solicitation and in some cases the purchasing.

PFF 89. DSCP was so concerned about the situation that the Contracting Officer noted in his pre-negotiation memorandum that "[t]he Contracting Officer anticipates filing such a [size] protest should M&S be selected for award." PFF 89. This meant that the Contracting Officer himself intended to protest M&S' size because of its complete reliance upon City Produce /Sysco.

On March 12, 2008, Hardie's was notified by DSCP that M&S had been selected as the apparent successful offeror for the San Antonio Zone. PFF 95. This pre-award notice is required by law in small business set asides to permit the filing of size protests by other offerors or by the Contracting Officer. Hardie's, after investigating M&S and becoming aware of the relationship between M&S Foods and City Produce/Sysco, timely filed a size protest.

Hardie's protest was referred to the SBA Area Office for Region III in Atlanta, Georgia. The Area Office reviewed materials submitted to it by M&S and DSCP, and

concluded that M&S was not a bona fide small business because of its undue reliance upon City Produce/Sysco for performance of the requirements of the Solicitation. The Area Office also found that the SBA's issuance of a nonmanufacturer waiver permitting offerors to purchase of produce from large growers and processors did not permit offerors to subcontract the primary and vital requirements of the Solicitation.

M&S timely appealed that Area Office's adverse size determination to the SBA Office of Hearings and Appeals ["OHA"]. The OHA reversed the decision of the Area Office. The Administrative Law Judge ["ALJ"] assigned to the appeal held that the issuance of the nonmanufacturer waiver permitted offerors to subcontract any of the primary and vital functions under the Solicitation, and that the existence of a nonmanufacturer waiver precluded the Area Office from finding affiliation between M&S and City Produce/Sysco.

## III. ARGUMENT

### A. Standard for Grant of Judgment on the Administrative Record

Motions for judgment upon the administrative record are treated in accordance with the rules governing motions for summary judgment. RCFC 56.1(a); see Nickerson v. United States, 35 Fed. Cl. 581, 588 (1996), aff'd, 113 F.3d 1255 (Fed. Cir. 1997). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Jay v. Secretary of Dept. of Health and Human Serv., 998 F.2d 979, 982 (Fed. Cir. 1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. Anderson, 477 U.S. at 248. The court may review an agency's procurement action on cross-motions for judgment on the

administrative record "because the issues are matters of contractual and regulatory interpretation." See Analytical & Research Tech., Inc. v. United States, 39 Fed. Cl. 34, 43 (1997).

B. Standard of Review

In reviewing decisions of administrative agencies, such as the United States Defense Logistics Agency and the Small Business Administration, the Court declares unlawful and set aside all agency action, findings, and conclusions that it finds "arbitrary, capricious, an abuse or discretion, or otherwise not in accordance with law." 5 U.S.C. §706 (2)(A).

In this case, there is a second layer to the standard of review. The decision contested is an administrative appeal decision of the SBA Office of Hearings and Appeals from a size determination of an SBA Area Office. Under SBA's regulations, OHA was required to uphold the Area Office's determination unless there existed in the record a "clear error of fact or law". 13 CFR § 134.314. OHA itself has described that standard as follows: "In evaluating whether mere is a clear error of fact or law, OHA does not consider Appellant's size de novo. Rather, OHA reviews the record to determine whether the Area Office based its size determination upon a clear error of fact or law." EA Engineering, Science, and Technology, Inc., SBA No. SIZ-4973 (2008). Therefore, this Court must determine whether OHA correctly found that the Area Office's decision contained a clear error of fact or law. If this Court finds no such clear error, or finds that OHA violated 13 CFR §134.314 by conducting a de novo review of M&S' size, then this Court must set aside the decision of OHA.

C. The Area Office's Decision Was Correct

The Area Office found that M&S was "other than small" because it found M&S to be affiliated with City Produce, its subcontractor, and City Produce's affiliates including Freshpoint, Inc. and Sysco Corporation. To fully appreciate that decision, it is important to view it in the context of the regulatory framework applicable to size determinations, and then view the facts contained in the record in light of that framework.

1. How Does SBA determine the Size of A Company?

In general, the size of a company for the purposes of the various programs administered by the SBA is determined by one of two metrics: either the three-year average annual revenues reported on their tax returns or the total number of employees of the firm in question and its affiliates. 13 CFR §121.104 - § 121.106. These metrics are compared to size standards which are grouped according to the North American Industry Classification System codes. 13 CFR § 121.201. The revenue or employee metric of the company is compared to the size standard associated with the NAICS code selected by the Contracting Officer for the Solicitation in question. If the metric exceeds the standard, the firm in question is "other than small". See 13 CFR §121.101.

2. How Does SBA Determine the Size of a Manufacturing Company?

SBA regulations generally divide firms into one of three categories: construction, services, and manufacturing. In the instant case, the Solicitation was assigned a manufacturing NAICS code 424480 "Fresh Fruit and Vegetable Merchant Wholesalers", a manufacturing code, and therefore the size of the offerors is judged by standards applicable to manufacturers. As stated above, size is generally determined by

reference to the metrics of either average annual revenue or number of employees. However, for certain industries there are additional criteria in determining size. With respect to manufacturing in particular 13 CFR §121.406(a), provides that in order to qualify as a small business, the firm in question must either itself be a domestic manufacturer of the end product being procured, or must satisfy the requirements of paragraphs (b),(c) and (d) of that section.

Paragraph (b), which is derived directly from the Small Business Act, 15 USC § 637(a)(17), provides that where the firm is not the manufacturer of the end product, but is instead a "non-manufacturer", it must meet three separate and distinct criteria to be considered "small". First, the firm must not exceed 500 employees. Second, the firm must be "primarily engaged" in retail or wholesale trade of the item being supplied, and finally and most importantly for this case. Finally, the firm must either be able to supply an end product that is produced by another small business or must obtain a waiver of the requirement to provide an end product of another small business.

3. Determining the Number of Employees of a Company

SBA regulations at 13 CFR § 121.106 "**How does SBA calculate number of employees?**" provides in paragraph (a) that a firm's number of employees includes all individuals employed on a full-time, part-time, or other basis, including employees obtained from a temporary employee agency, professional employee organization or leasing concern. 13 CFR § 121.106(a).

Subparagraph (b)(4) of that section provides that where the applicable size standard is expressed in a number of employees, "[t] The average number of employees of a business concern with affiliates is calculated by adding the average

number of employees of the business concern with the average number of employees of each affiliate." 13 CFR § 121.106(b)(4); Peerless Chain Company, SBA No. SIZ-4784 (2006) ("Appellant's ability to qualify as a small business under [a manufacturing NAICS code] depends upon Appellant's employee count plus the total number of employees of its affiliates.").

Therefore, in determining whether a "non-manufacturer" firm meets the first criteria for being a "small business" number of employees both the number of employees of the firm and its affiliates must be considered.

4. What Is An "Affiliate"?

The term "affiliate" as used in the context of size determinations is a very broad term. Determination of whether "affiliation" for size purposes exists is governed by 13 CFR § 121.103 "**How does SBA determine affiliation?"**.

That regulation at 13 CFR § 121.103(a) provides the general principles of affiliation which is that firms are affiliates of each other when one controls or has the power to control the other, or a third party, or parties controls or has the power to control both. It does not matter whether control is exercised, so long as the power to control exists. Under this general principle of affiliation SBA considers factors such as ownership, management, previous relationships with or ties to another concern, and contractual relationships, in determining whether affiliation exists. Control may also be affirmative or negative. In determining whether affiliation exists under 13 CFR §121.103(a), SBA will consider the totality of the circumstances, and may find affiliation even though no single factor is sufficient to constitute affiliation.

In addition to that general principle of affiliation, there are six specific independent bases for a finding of affiliation. 13 CFR §121.103(c)-(i). These include affiliation based upon: 1) stock ownership, 2) stock options or agreements to merge, 3) common management, 4) identity of interest (familial relation), 4) the "newly organized concern rule", 5) formal and de facto joint ventures, and finally 6) franchise and license agreements. 13 CFR §121.103(c)-(i). These are independent bases, separate and apart from the general affiliation rule in 13 CFR §121.103(a). The H. L. Turner Group, Inc., SBA No. SIZ-4896 (2008).

5. Sysco Is an Affiliate of M&S

The facts as contained in the administrative record demonstrate that the Intervenor, M&S Foods, is affiliated with Sysco Corporation through its ties to Sysco's wholly owned subsidiaries City Produce Freshpoint. This affiliation arises under the "common management" rule of §121.103(c), under the joint venture affiliation rule of §121.103(h), and the general affiliation rules of 121.103(a).

a. Common Management

Affiliation via "common management" arises, among other circumstances, where one or more officers who have the ability to control the management of one firm also have the ability to control the management of another firm. 13 CFR § 121.103(c).

As discussed in the Statement of Undisputed Facts and the Statement of the Case above, the copy of M&S' proposal that is in the administrative record contains payment instructions from M&S to the Government for payments to be made under the

contract. PFF 60. That payment information provides remittance instructions that nominally direct payment to M&S, but at an address that is the worldwide corporate headquarters of Sysco Corporation. PFF 60. Moreover, the person to whom payments are to be directed, and who is also listed as the point of contact for all M&S accounts receivable is a Mr. Drew Yurko. PFF 61-62. Mr. Yurko is Vice President and Chief Financial Officer of Freshpoint, Inc., a Sysco subsidiary that is North America's largest fresh produce distributor. Mr. Yurko, as Vice President and CFO is an officer of Freshpoint, Inc. and therefore has the ability to control Freshpoint, Inc. M&S' proposal at AR 1526 clearly represents Mr. Yurko as an M&S employee, representing his address to be an M&S address and providing an M&S email for Mr. Yurko. Since Mr. Yurko is apparently in control of accounts receivable for M&S, he is directly and substantially involved in the management of M&S and therefore has power to control M&S within the meaning of § 121.103(c). Accordingly, M&S and Freshpoint (Sysco) are affiliated under this independent basis for affiliation.[1]

b. <u>Joint Venture The "Ostensible Subcontractor Rule"</u>

As stated above, the independent affiliation basis of joint venture may arise from a formal joint venture, or may arise where there is a de facto joint venture. Here, M&S and the Sysco entities do not have a formal joint venture agreement. Therefore, the question is whether a de facto joint venture for size purposes exists. SBA's regulations provide that "SBA may also determine that the relationship between a prime contractor

---

[1] If Mr. Yurko is not an officer of M&S (and even if he is), M&S' provision of Sysco's corporate headquarters address and a high level Sysco employee for remittance of all contract payments and for all accounts receivable issues raises serious concerns that M&S has made active misrepresentations of fact to the Government in its proposal.

and its subcontractor is a joint venture, and that affiliation between the two exists[.]" SBA does so by applying what is commonly referred to as the "ostensible subcontractor rule", set forth in 13 CFR § 121.103(h)(4), which provides:

> A contractor and its ostensible subcontractor are treated as joint venturers, and therefore affiliates, for size determination purposes. An ostensible subcontractor is a subcontractor that performs primary and vital requirements of a contract, or of an order under a multiple award schedule contract, or a subcontractor upon which the prime contractor is unusually reliant. All aspects of the relationship between the prime and subcontractor are considered, including, but not limited to, the terms of the proposal (such as contract management, technical responsibilities, and the percentage of subcontracted work), agreements between the prime and subcontractor (such as bonding assistance or the teaming agreement), and whether the subcontractor is the incumbent contractor and is ineligible to submit a proposal because it exceeds the applicable size standard for that solicitation.

13 CFR §121.103(h)(4).

The SBA office of Hearings and Appeals has summarized the "ostensible subcontractor" analysis under § 121.103(h)(4) as follows:

> The purpose of 13 C.F.R. § 121.103(h)(4) is to prevent other than small firms from forming relationships with small firms to evade SBA's size requirements. The ostensible subcontractor rule permits an area office to determine a subcontractor and a prime have effectively formed a joint venture (and are thus affiliates) for determining size.
> In determining whether or not there has been a violation of the ostensible subcontractor rule, area offices must evaluate "all aspects of the relationship between the prime and the subcontractor." The word "all" has a simple meaning, i.e., an area office must consider the full scope of the relationship between the prime and the subcontractor.
> The Area Office used the "seven factors test" to evaluate the relationship between Appellant and Garco. The "seven factors test" is an earlier way of encapsulating what has become the ostensible subcontractor rule codified in 13 C.F.R. § 121.103(h)(4). These seven factors are now almost twenty years old; they are neither exclusive nor exhaustive,

> nor do they address "all aspects" of the prime contractor/subcontractor relationship the Area Office is required to evaluate by 13 C.F.R. § 121.103(h)(4). Instead, area offices must, at a minimum, consider the aspects listed in 13 C.F.R. § 121.103(h)(4) and should analyze factors outside of the seven factors if relevant. See Size Appeal of FDR, Inc., SBA No. SIZ-4781 (2006); Size Appeal of Taylor Consultants, Inc., SBA No. SIZ-4775 (2006). In their analyses, area offices may choose to concentrate on one factor if it is dominant or persuasive. See Size Appeal of Ahuska Int'l Security Corp., SBA No. SIZ-4752 (2005). Therefore, while it is acceptable to consider the seven factors, the area office must evaluate "all aspects" of the prime contractor/subcontractor relationship to determine if the ostensible subcontractor rule applies.
> As explained in Size Appeal of Lance Bailey & Associates, Inc., SBA No. SIZ-4817, at 16-17 (2006), "all aspects" is equivalent to considering the totality of the circumstances, but unlike a finding of affiliation based upon the totality of the circumstances under 13 C.F.R. § 121.103(a)(5), affiliation based on the ostensible subcontractor rule applies only to the contract at issue and not to the concern's status for future procurements.

TKTM Corporation, SBA No. SIZ-4885 (2008).

Here, the record clear shows that M&S and City Produce (Sysco) while ostensibly submitting a proposal as prime and subcontractor, are really operating as a joint venture within the meaning of § 121.103(h)(4).

This joint venture relationship begins with the teaming agreement between the parties themselves. The teaming agreement gives City Produce (Sysco) the unfettered power to "review and approve" every act by M&S including proposal preparation, negotiations with the Government, and overall responsibility for contract performance. PFF47 - 49. Under the teaming agreement, M&S could do nothing without the review and approval of City Produce (Sysco). This teaming agreement was not just a private

agreement, it was a central part of M&S' proposal, upon which the Government explicitly relied in reviewing M&S' proposal. PFF 43, 68-75.

The evaluation criteria in the Solicitation identify warehousing of produce, turnover of warehouse inventory, and maintenance of temperature and humidity as the most important element of technical criteria for award. M&S' own proposal and the agency's evaluation of that proposal make clear that City Produce (Sysco) would perform 100% of those most important functions of the contract. M&S has no capability whatsoever to perform these functions as it has no warehouses of its own.

The second most important technical evaluation criteria was past performance. Here, M&S relied equally on the past performance of itself and City Produce (Sysco). PFF 73-74. The record clearly demonstrates that the agency's scoring of this factor of M&S' proposal was based equally on the record of M&S and City Produce (Sysco). PFF 73-74. They were scored as a joint venture because they are a joint venture.

The third most important aspect of performance evaluated in the evaluation criteria was the distribution plan. PFF 30 Here again, the agency's evaluation of M&S' proposal was based <u>entirely</u> on the capabilities of Sysco because M&S has no distribution capability. PFF 75, 93-95.

The only aspects of performance which M&S' actual proposal explicitly claimed M&S would perform with its own efforts were undefined "day to day management of this solicitation" (PFF 40), undefined "responsib[lity] for all accounts payables and receivables incurred in this solicitation" (PFF 40). Aside from the lack of definition of these functions, M&S, located in Florida, with only seven employees obviously could not literally manage the operation of multiple City Produce (Sysco) warehouses and

hundreds of City Produce (Sysco) trucks on a day to day basis City Produce (Sysco) would manage those functions.

What M&S really proposed to do with its own efforts was no more than receive orders from the Government, pass those orders to City Produce (Sysco) to be filled, bill the Government, and accept payment. Even in this, M&S' proposal is inconsistent as M&S proposed that the Vice President and CFO of City Produce (Sysco) would actually have ultimate responsibility for billing the Government and receiving payment from the Government.

In any event, those functions, while certainly literally necessary to performance were not "primary and vital functions" under the contract. They were not even important enough to merit consideration as part of the technical evaluation of the proposals.

c. Primary and Vital Requirements

Furthermore, under the plain language of 13 CFR § 121.103(h)(4), it does not matter if the prime contractor performs some of the primary and vital requirements of the solicitation; that is not the test at all, and in fact turns the analysis required by that paragraph on its head. The focus is not on what the prime contractor is doing, it is on what the subcontractor is doing.

The plain language of that paragraph states that if the subcontractor performs primary and vital requirements it may be found to be an "ostensible subcontractor" and treated as an affiliate by joint venture of the prime contractor. Here the record is clear that not only is City Produce (Sysco) performing many primary and vital requirements of the Solicitation, but City Produce (Sysco) is performing the clear majority of the primary and vital requirements of the Solicitation. All of the primary and vital requirements of

performance that were actually evaluated in the technical evaluation process were to be performed by City Produce (Sysco) alone.

The ALJ seemed to confuse this analysis, and asserted that there was no "ostensible subcontractor" relationship, because M&S would perform some primary and vital requirements, specifically the ALJ found that M&S would:

> The solicitation places significant importance on the successful awardee's customer service and support functions. The solicitation requires the successful awardee to: maintain an electronic catalog of items available; have a dedicated customer service representative; provide weekly produce market forecasts; interface with the government's web based ordering tool; insure produce availability; invoice transactions; create electronic reports; and direct appropriate quantities of produce to the proper locations at the best price. These are all requirements Appellant is responsible for performing without reliance on City.

Although the ALJ states (without explanation or citation to the record) that the Solicitation places "significant importance" on those functions, none of them were even significant enough to be made a technical evaluation criteria. Furthermore, there is no support in the record for the assertion implicit in the ALJ's statement that all other functions in the solicitation are not "primary and vital requirements". The ALJ does not explain how warehousing and delivery are not primary and vital requirements of the Solicitation when the award criteria turned primarily on those functions. Indeed, the only other technical evaluation criteria (past performance and mentoring agreements) did not involve performance requirements.

Moreover, the ALJ's finding that M&S would perform these functions without reliance on Hardie's is contrary to the evidence that was before him. Most the functions cited by the ALJ breakdown into two categories- processing orders from the

government, and ordering product from suppliers. With respect to processing orders from the Government, M&S' own proposal indicated that Sysco would be directly involved in that process. PFF 91. In fact, the record indicates that M&S' true role in processing Government orders was to receive them and then forward them multiple times per day to City Produce (Sysco). PFF 91.

The same is true of ordering product from suppliers. There is no more telling evidence of that than the fact that every single vendor quotation submitted by vendors for the market basket items was submitted to Freshpoint City Produce, not M&S. M&S is not even mentioned in a single invoice. The record provides no reasonable basis to believe that this would change post award.

In any event, as the Area Office correctly observed, the NAICS? definition of a Wholesaler is one who not only takes orders for product, but who also actually stores, handles, "divides and delivers" that product to its customers which in the case of wholesalers are other businesses. Exhibit 9 at 7. M&S does none of these things. Thus, to the extent that OHA found that a wholesaler need only facilitate the purchase of goods from one entity for delivery to another without actually storing, handling, dividing and delivering any of the goods, that finding was legally erroneous. The apparent OHA definition of a wholesaler does not comport with the NAICS definition, and no other authority exists for it.

Accordingly, because Hardie's will be performing most of the primary and vital requirements of the Solicitation, and will be directly involved in the requirements performed by M&S, the application of the ostensible subcontractor is appropriate and M&S and City Produce (Sysco) are affiliated.

d. Undue Reliance

Paragraph 121.103(h)(4) also states in the disjunctive that "unusual reliance" by the prime contractor on a putative subcontractor can also be a basis for finding affiliation under the "ostensible subcontractor rule". Here, it is clear that M&S is unusually reliant upon City Produce (Sysco) because, quite simply, M&S could not begin to perform the contract without Sysco. Sysco is:

- Providing all food warehousing, and 44
- Providing all inventory, and 30
- Providing all delivery, and 43
- Is actively involved in processing orders from the Government in the STORES system, and 54
- CFO is in charge of receiving payment from the Government, and 61-63
- Provided 100% of the quotations in the market basket without any involvement of M&S, and 85, 86
- Under their teaming agreement, every decision of M&S is subject to review and approval 47-49
- M&S confirmed in discussions that there would be no other subcontractors 91

PFF 44, 38, 54, 61-63, 85, 86, 47-49, 91.

In light of these facts, the relationship between M&S and City Produce (Sysco) could easily be called a "textbook case" of an ostensible subcontractor relationship. This relationship is precisely the kind of relationship that §121.103(h)(4) is meant to stop- "other than small firms from forming relationships with small firms to evade SBA's size requirements."

Accordingly, under either the "primary and vital requirements" prong, or the "unusually reliant" prong, or for that matter the "totality of the circumstances" test in OHA's caselaw, the application of "ostensible subcontractor rule" is appropriate.

6. Effect of Affiliation

As explained at length above, since M&S and City Produce (Sysco) are affiliated their employees and those of their own affiliates are aggregated for size purposes. Since the record demonstrates that the sum of M&S and Sysco's employees vastly exceeds the applicable size standard, M&S cannot meet the 500 employee limitation in 13 CFR § 121.406(b)(i).

D. The Area Office's Determination

The Area Office reviewed all of the documentation cited in the above analysis, and arrived at the same conclusion that M&S was affiliated with the various Sysco owned entities because M&S was unusually reliant upon City Produce (Sysco), who was to be performing primary and vital requirements of the Solicitation. In arriving at that conclusion the Area Office employed the ostensible subcontractor, seven factors and totality of the circumstances analyses discussed above.

Although the Area Office did not discuss the common management issue, presumably because it did not investigate the identity of Mr. Yurko, that factor weighs in favor for the Area Office's ultimate determination that M&S and the Sysco owned companies are affiliated.

The Area Office noted the issuance of the nonmanufacturer waiver, but correctly observed that the waiver does not relieve M&S from the obligation to perform the primary and vital requirements of the contract with its own efforts, and does not prevent application of the ostensible subcontractor rule. PFF 10, 11. As discussed below, the Area Office was correct in that holding because a nonmanufacturer waiver does not waive any requirement other than the requirement that the end product be

manufactured by a small business. A nonmanufacturer waiver does not waive any other requirement of law or the Solicitation terms.

E. Non-Manufacturer Waiver

As stated above, 13 CFR § 121.406(b)(1) sets forth three requirements for a firm that does not manufacture the end product to be delivered to be considered a small business. First is the 500 employee limit discussed above, which M&S fails to meet. 13 CFR §121.406(b)(1)(i). Second is the requirement that the firm be "primarily engaged" in the retail or wholesale trade and normally provides the type of item being procured. 13 CFR §121.406(b)(1)(ii).The second prong is not at issue in this case.
The third prong, which is central to this case, is that the firm must provide an end product that is manufactured by a small business un less a waiver of that requirement is obtained pursuant to § 121.403(b)(3). 13 CFR § 121.406(b)(1)(iii). It is first critical to this analysis to note that the mention of a waiver appears only in subparagraph (b)(1)(iii), and therefore refers only to the requirements of subparagraph (b)(1)(iii). That reference to a waiver in subparagraph (b)(1)(iii) cannot reasonably be interpreted to waive the requirements of subparagraphs (b)(1)(i) or (b)(1)(ii) or any requirements associated with those other two subparagraphs.

This is critical because the ALJ either expressly or impliedly implicitly? found that the waiver under subparagraph (b)(1)(iii) in the instant case also waived the requirements of (b)(1)(i) when the ALJ erroneously stated (without citation to authority) that the existence of a waiver precludes the application of an ostensible subcontractor analysis. The ostensible subcontractor analysis relates only to the calculation of the

number of employees of the firm, this analysis has no relationship whatsoever to the end product requirements of subparagraph (b)(1)(iii).

The limited nature of the waiver's scope is confirmed by §121.406(b)(3) which states that "[t]he Administrator or designee may waive the requirement set forth in paragraph (b)(1)(iii) under the following two circumstances". Emphasis added. Thus, where a non-manufacturer waiver is granted the only requirement that is waived is the requirement that the end product be manufactured by a small business.

In the instant case, it means that the successful offeror does not have to, for example, grow its own lettuce nor provide lettuce grown by another small business. It can buy lettuce from a large business. However, that is all that a waiver of this kind can ever waive under the plain language of the regulations. Other than the identity of the end product manufacturer, no other Solicitation requirement is waived, and no other requirement of SBA's size regulations is waived, particularly including the ostensible subcontractor analysis.

The Area Office correctly recognized the limited nature of the waiver's effect, and correctly applied the ostensible subcontractor analysis. The Area Office did not find affiliation because M&S proposed to provide lettuce or other produce grown by a large business. The Area Office found affiliation on the basis of M&S' undue reliance on City Produce (Sysco) for performance of critical Solicitation requirements that have nothing to do with who originally grew the food. The Solicitation, in fact, has no provisions or requirements relating to the actual manufacturer or growing of the food products to be provided. The waiver, therefore, is not relevant to any Solicitation performance requirements.

Accordingly, when the ALJ in the instant case set about to determine "does the waiver include warehousing and delivery", the ALJ had already started down an improper path. Under the plain language of the regulations, the waiver cannot include anything other than whether the product itself was grown or manufactured by a small business. There is no basis in the regulations or caselaw for the ALJ assertion that the waiver may extend any further than that. Indeed, the ALJ did not cite any legal authority for his belief that the effect of a waiver can extend beyond the source of the product.

1. <u>"Class Waivers" v "Individual Waivers"</u>

This false dichotomy is another respect in which the ALJ ventured beyond the plain language of the regulations without citation to any authority. The ALJ conclusory asserted in his decision that "[a]n individual waiver is more comprehensive in scope than a less specific class waiver[.]" SBA's regulations 13 CFR §121.406(b) does not so state. The differentiation the two types of waivers is simply as follows:

> (3) The Administrator or designee may waive the requirement set forth in paragraph (b)(1)(iii) of this section under the following two circumstances:
>
> (i) The contracting officer has determined that no small business manufacturer or processor reasonably can be expected to offer a product meeting the specifications (including period for performance) required by a particular solicitation and SBA reviews and accepts that determination; or
>
> (ii) SBA determines that no small business manufacturer or processor of the product or class of products is available to participate in the Federal procurement market.
>
> (4) The two waiver possibilities identified in paragraph (b)(3) of this section are called ``individual'' and ``class'' waivers respectively, and the procedures for them are contained in Sec. 121.1204.

13 CFR § 121.406(b)(3) & (4). Thus, SBA's regulations quoted above do not give either type of waiver any broader scope, certainly not with respect to the requirements of a solicitation. In both cases, all that is waived is the size of the manufacturer of the end product, not any other requirement of law or the Solicitation.

SBA's regulations at 13 CFR § 121.1201 through § 121.1205 set out the procedures by which the two types of waivers, class and individual, are granted. There is no indication whatever in those procedures that either type of waiver is "more

comprehensive in scope" than the other in terms of the effect of the grant of such waiver on a particular procurement. Viewed from a practical perspective, a "class waiver" is much "broader" because it is a blanket statement that no small business manufacturer produces the end item in question under any circumstances.

In any event, since the waiver relates only to the identity of the end product manufacturer (or grower), and not to any other aspect of size or contract performance, there is no logical basis to say that one type of waiver is "broader" than the other. They have precisely the same effect when issued. The only differences between them are: 1) the manner of their issuance and 2) that one applies to all procurements for an item while the other applies to only a single procurement of an item. See 13 CFR § 121.406(b) and § 121.1201 et seq.

Accordingly, the ALJ erred as a matter of law in holding that the fact that the non-manufacturer waiver in the instant case was an "individual waiver" rather than a "class waiver," made the waiver "broader" in the sense that it waived M&S' responsibility to perform primary and vital services required by the solicitation. As with other portions of his decision, the ALJ cites no regulations or case law which support that holding.

2. The Agency's Waiver Request was Narrow and Did Not Include Warehousing and Delivery

Even assuming, arguendo, that it is possible for a non-manufacturer waiver to waive anything other than the size of the true manufacturer of the end product, the record here shows that the waiver requested by the agency and issued by SBA was limited in scope. The scope of the agency's request for a waiver of the non-

manufacturer rule is best captured by the supporting memorandum to the agency's request which stated plainly:

> Market Research indicates that while numerous small business distributors exist to potentially support these customers, none of these distributors carry product grown and processed by small businesses.

AR 000990.

That is the scope of the waiver that DSCP sought, and which SBA issued- a waiver of the requirement that the fresh fruit and vegetables supplied under the contract themselves be grown or processed by a small business. The agency's waiver request does not anywhere indicate or suggest that a small business is not capable of meeting the primary and vital warehousing and delivery requirements of the Solicitation with its own resources. Accordingly, there is no basis in the record upon which to conclude that the agency sought a waiver that would include <u>any</u> of the primary and vital requirements set forth in the Solicitation's statement of work or evaluation criteria.

Accordingly, the ALJ was plainly incorrect in suggesting that "it is clear that the individual waiver applies to the entire procurement, including warehousing and delivery of the produce." That is not what the agency requested, is not what the SBA issued, and would be plainly illegal. Moreover, if the ALJ's statement of the law of non-manufacturer waivers were correct, the waiver would completely swallow the small business set aside. If nothing, no part of the Solicitation requirements have to be performed by the small business where a waiver is granted, then a firm could subcontract 100% of the effort and still be considered small. The ALJ's view is plainly not the intent of the statute or the regulations, and finds no support in caselaw.

The ALJ, therefore, had it precisely backwards when they asserted without explanation that the Area Office's proper view of the scope of the waiver would prevent the waiver from serving its intended purpose. On the contrary, the ALJ's view would permit the self-proclaimed largest food distributor in North America (City Produce (Sysco)) to perform the bulk of the actual requirements of the Solicitation while nominally serving as subcontractor to a small firm. That was not the purpose of the waiver. Properly interpreted, the waiver would permit a firm like Plaintiff Hardie's, who has the capability to perform all of the ordering, warehousing, and delivery requirements of the Solicitation but which must provide some produce grown by large business growers to submit an offer.

## IV. CONCLUSION

As discussed at length above, it is clear on the face of applicable SBA regulations that a nonmanufacturer waiver can only waive one requirement- that the end product to be supplied be manufacturer by a small business. It is simply not possible for a nonmanufacturer waiver to have any broader effect. The ALJ plainly erred when it found that the issuance of a nonmanufacturer waiver in this case not only relieved offerors of the duty to purchase produce from a small business, but also relieved offerors of the duty to perform all of the primary and vital functions of the contract with their own efforts.

The ALJ also erred when he held that Hardie's was not performing primary and vital requirements of the Solicitation. The record is quite clear that not only were the requirements for warehousing and delivery primary and vital, they were the primary aspects of performance used by the Government in its evaluation criteria to choose a

successful offeror. Further, the ALJ's finding that M&S would be performing primary and vital requirements of the contract by receiving orders and sending them to City Produce (Sysco) is not consonant with the record which shows that City Produce (Sysco) was directly involved in that process, and indeed provided all of the grower quotations in M&S' price proposal.

Accordingly, the ALJ erred in reversing the size determination of the Area Office. The Area Office correctly analyzed the facts and the law and found M&S to be a large business due to its affiliation with Sysco and Sysco's subsidiaries. Hardie's is therefore entitled to judgment upon the administrative record, and respectfully prays that its Motion be granted.

Dated: September 3, 2008

Respectfully Submitted,

/s/ Johnathan M. Bailey

Johnathan M. Bailey
SBN 24000009

Of Counsel:
BAILEY & BAILEY, P.C.
Milam Building, Suite 711
115 East Travis
San Antonio, Texas 78205-1611
Telephone: (210) 225-7747
Facsimile: (210) 225-8246

Attorneys for Plaintiff
HARDIE'S FRUIT &
VEGETABLE, CO.- SOUTH, LP.